Luis A. SANTIAGO, Plaintiff,

v.

CITY OF VINELAND,
et al., Defendants.

No. 97–5110.

United States District Court,
D. New Jersey.

Aug. 2, 2000.

F. Michael Daily, Jr., Quinlan, Dunne & Daily, P.A., Merchantville, NJ, for Plaintiff, Luis A. Santiago.

Lars S. Hyberg, McAllister, Hyberg & White, P.C. Executive Plaza–Suite, Northfield, NJ, for Defendants, City of Vineland, Joseph Romano and John P. Gallo.

A. Michael Barker, Joseph M. Scott, A. Michael Barker & Associates, P.C.,Northfield, NJ, for Defendants, Mario Brunetta, Paul Letizia, John Fresne and Dennis D'Augostine.

OPINION

ORLOFSKY, District Judge.

## Table of Contents

I. BACKGROUND ...................................................520

II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT ...................................................526

III. DISCUSSION ...................................................527
 A. Failure to Exhaust Administrative Remedies: Title VII .....................527
 B. Santiago's Discrimination Claims on Grounds of Race, Disability and Retaliation ...................................................529
 1. *Race Discrimination under 42 U.S.C. §§ 1981 and 1983 and the New Jersey Law Against Discrimination ("NJLAD")* ..................531
 a. The Prima Facie Case Analysis: Was Santiago "Qualified?" ..........532
 b. The Defendants' Legitimate, Nondiscriminatory Reasons .............533
 c. Pretext for Discrimination ........................................534
 i. The Narcotics Allegations ...................................534
 ii. New Jersey's Rule of Three....................................536
 iii. Robert Carr ................................................537
 iv. The Negative Recommendation ..............................537
 d. Liability of the Defendants........................................538
 i. Race Discrimination in violation of 42 U.S.C. §§ 1981 and 1983 ...................................................538
 (a) The City of Vineland .....................................538
 (b) The Individual Defendants ...............................540
 (c) Defendants Romano and Gallo .............................542
 ii. Race Discrimination in violation of the NJLAD .................543
 e. Qualified Immunity ..............................................545
 2. *Disability Discrimination under the Americans with Disabilities Act and Handicap Discrimination under the New Jersey Law Against Discrimination ("NJLAD")* ......................................546
 3. *Retaliation* ...................................................550
 a. Individual Defendants Brunetta, Frense, Letizia and D'Augostine.....551

 b. The City of Vineland and Individual Defendants Romano and
 Gallo ................................................................552
 C. 42 U.S.C. §§ 1981A, 1982, 1983, 1985, 1986 and 1988 ........................554
 1. *Violation of Due Process of Law* ....................................554
 a. The Alleged Failure to Provide a PreDeprivation Hearing............554
 b. Municipal and Individual Liability ..............................557
 c. Qualified Immunity .........................................559
 2. *Conspiracy, pursuant to 42 U.S.C. § 1985(1)* ..........................559
 3. *Remaining Claims* ................................................560
 D. False Arrest ..........................................................560
 E. Malicious Prosecution .................................................565
 F. Common Law Breach of Contract and Intentional Interference with
 Contractual Relationship..............................................566
 G. The Tort of "Outrage" .................................................568
 H. Santiago's Claims for Punitive Damages ................................568
 1. *The City of Vineland*..............................................569
 2. *The Individual Defendants* ........................................569

IV. CONCLUSION ................................................................570

In this employment discrimination suit, this Court is called upon to determine, among other things, whether undesirable personality traits constitute an "impairment" under the Americans with Disabilities Act and whether a municipal special law enforcement officer who, by State statute, can be discharged only "for cause after an adequate hearing" is entitled to a pre-termination hearing when he is accused of selling illegal drugs at some point in the past. Plaintiff Luis A. Santiago ("Santiago"), a former special law enforcement officer of the City of Vineland, has filed an Amended Complaint alleging that the City, its former mayor and various police officials violated his federal and constitutional rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Counts One and Six), the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.* (Counts Four and Six), and 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988 (Count Three). *See* Am. Compl. at ¶¶ 43–46, 51–61, 65–67. In addition, Santiago alleges discrimination and retaliation claims under the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* (Counts Two, Four and Six), as well as the common law claims of false arrest (Count

Five), malicious prosecution (Count Five), breach of contract (Count Seven), intentional interference with his contractual relationship (Count Eight), and the tort of "outrage" (Count Nine). *See id.* at ¶¶ 47–50, 56–74.

Before this Court are two motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), filed by the two sets of defendants in this case, the City of Vineland, Joseph Romano and John P. Gallo and by Mario Brunetta, Paul Letizia, John Fresne and Dennis D'Augostine (collectively, "Defendants"). *See* Notice of Motion for Summ. J. by Defs., City of Vineland, Joseph Romano and John P. Gallo at 1 (filed Aug. 6, 1999); Notice of Motion for Summ. J. by Defs., Mario Brunetta, Paul Letizia, John Fresne and Sennis [sic] D'Augostine at 1 (filed Aug. 6, 1999). Because both motions for summary judgment rely on substantially similar grounds, and because Santiago has submitted only one brief in opposition to the motions for summary judgment, I shall consider the merits of the motions jointly, where appropriate. This Court exercises jurisdiction pursuant to 28 U.S.C. § 1331,[1] 1343,[2] and 1367.[3] For the reasons set

---

**1.** Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1994).

**2.** 28 U.S.C. § 1343 (1994) provides:

 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

forth below, I shall grant in part and deny in part the Defendants' motions for summary judgment.

## I. BACKGROUND

The issues in this case are presented within the framework of three overarching factual events: (1) Santiago's discharge from his position as a Vineland special law enforcement officer; (2) the City of Vineland's failure to hire Santiago as a police officer; and (3) Santiago's subsequent arrest for unlawful possession of a weapon, in violation of N.J.S.A. 2C:39–5(b) (West Supp.2000).

On September 3, 1992, Plaintiff, Luis A. Santiago, who is Hispanic, applied for the position of special law enforcement officer in the City of Vineland. *See* Pl.'s App. to Br. in Opp. to Motion for Summ. J. ("Pl.'s Ex.") Vol. I (Vineland Special Police Applicant Investigation) at 1. As part of the application process, Dr. Donald Babcock of the Vineland Guidance Center evaluated Santiago, found him "psychologically fit," and recommended him for the position. *See* App. to Br. in Supp. of Mot. for Summ. J. by Defs. City of Vineland, Joseph Romano and John P. Gallo ("Defs.' Ex.") 2 at 7 (referencing Jan. 18, 1993 Babcock evaluation). On April 26, 1993, Luis A. Santiago was appointed as a special law enforcement officer of the City of Vineland. *See* Pl.'s Ex. Vol. I (Oath of Office, dated April 26, 1993). The post is for a term not to exceed one year and the appointment "may be revoked by the local unit for cause after adequate hearing." N.J.S.A. 40A:14–146.13 (West 1993). Santiago was reappointed to the position three separate times. *See* Pl.'s Ex. Vol. 1 (Oaths of Office, dated April 25, 1994, May 22, 1995, and Jan. 29.1996).

During his tenure as a special law enforcement officer, Santiago applied for a position with the Cumberland County Sheriff's Department, for which he underwent another psychological evaluation with Dr. Babcock. *See* Defs.' Ex. 32 at 1. On July 20, 1995, Dr. Babcock reported his psychological evaluation of Santiago, which included the following:

> Mr. Santiago was married in June[,] 1992 and separated in May, 1994. He claims financial and communication problems in the marriage which had minor domestic violence. He denied hitting but admitted grabbing. He felt she also had a temper. There will not be a reconciliation. There have been reports that he is physically abusive to his wife.

*Id.* at 2. In addition, Dr. Babcock reported that:

> [T]here is a real disturbing influence in his emotions at this time. This report compared with an earlier one conducted with him when he was applying for a

(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 or Title 42;
(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom, or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.
*Id.* at § 1343(a).

**3.** Section 1367 provides, in relevant part:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....
28 U.S.C. § 1367(a) (1994).

position in January[,] 1993 as a Class I officer for the Vineland Police Department—comparing the two results it can be seen that the break up of the marriage and perhaps other factors have contributed to a real change in his overall personality and emotional performance.... There is a lot of ambivalence in the handling of his aggression. There are times that he appears to be overly charming and wants everybody to like him and there are other times that he can act out emotionally, maybe even violently.... To all of this it is felt that he has a personality structure which would be detrimental to a law enforcement agency, to the general public and indeed himself. It is felt that the big change in him has made him unsuitable and unfit for carrying out the duties of a police officer at this time. Perhaps after his situation is cleared up, in his marital situation, he may be in a much better emotional state than he is at this time, but certainly at this writing, he would not be considered suitable for a police department.

*Id.* at 3–4. Dr. Babcock did not recommend Santiago for the position with the Cumberland County Sheriff's Department because, according to Dr. Babcock's report, "Santiago is not considered emotionally fit to carry out the duties of a law enforcement officer." *Id.* at 4.

A week after the date of the report, Santiago applied to the Vineland Police Department for the position of police officer. *See* Pl.'s Ex. Vol. I (Application, filed July 27, 1995). He placed twelfth on the New Jersey Department of Personnel's August 25, 1995 "Certifications of Eligibles for Appointment" list ("Eligibles List"). *See* Defs.' Ex. 11 at 2. On August 30, 1995, the Vineland Police Department recommended for hire four individuals, other than Santiago, the last of whom was ranked eleventh on the Eligibles List. *See* Defs.' Ex. 12. As the twelfth candidate on the list, Santiago was not considered for the August 30, 1995 hiring.

Consistent with standard application procedure within the Police Department, Sergeant John A. Fresne of the Vineland Police Department investigated Santiago's background and on September 15, 1995, he filed his report with the Department. *See* Defs.' Ex. 2. According to the report, it was Sergeant Fresne's opinion and recommendation that:

The applicant [Santiago] has had several disciplinary actions while he has been employed by this department. These actions include excessive speed in a police vehicle, sleeping while on duty, and being discourteous to a police officer and city officials of West Cape May. Although he has only received one letter of reprimand for sleeping while on duty, these allegations are indications that the applicant is immature and that there will be disciplinary problems.

The applicant has been attempting to gain employment from several different agencies with the latest being the Cumberland County Sheriff's Department. The applicant was sent for a psychological evaluation and it was determined that he is not psychologically fit to be a police officer and he was therefore turned down for the position.

Considering all of the above presented facts, I cannot recommend the applicant for the position of police officer. If in time, the applicant matures and he is re-evaluated and determined to be psychologically fit, I would reconsider my opinion and recommendation.

*Id.* at 14.

In early 1996, Santiago placed third on the New Jersey Department of Personnel's January 22, 1996 Eligibles List. *See* Defs.' Ex. 13. According to the deposition testimony of Sergeant Fresne, two days following the date of the Eligibles List, on January 24, 1996, Santiago was interviewed for the position of Vineland police officer. *See* Defs.' Ex. 37 (John Fresne Dep.) at 89. On January 25, 1996, Chief of Police Mario R. Brunetta, Jr. recommended for hire four individuals other

than Santiago. *See* Defs.' Ex. 14 at 1. A subsequent letter by Brunetta explained that Santiago, among others, was not considered for appointment because he had failed to respond to a certification notice signaling his interest and intent to remain eligible for hire. *See* Defs.' Ex. 15 at 1. In his deposition, Santiago testified that he had indeed failed to respond to the notice for the January, 1996 hiring. *See* Defs.' Ex. 35 at 41–43.

According to Santiago, at some point in January, 1996, a detective from the police department brought Santiago a cartoon drawing that had been posted at the Vineland Police Department. *See* Pl.'s Br. at ¶ 62. The cartoon is entitled "A Portrait of Spec. Santiago (Animal Control Lover)" and depicts Santiago as obese, with sinister eyes and a long mustache. *See* Defs.' Ex. 28. In the cartoon, the artist depicts Santiago as wearing bunny slippers, which the drawer calls "Roadkill–Takes His Work Home" and carrying both a "Child Size [sic] Radio For Those 'Wanna Be Cops Moments'" and a forked object, referred to as "Unauthorized Equip. For Dangerous Attacks from Killer Squirrels." *Id.* In addition, the cartoonist points to dark circles or bags under the subject's eyes, noting the "Hard Strenuous Nights Studying For His Psych" and, at the top of the drawing, the cartoonist quips, "Good Luck on Your Psych!!!" *Id.* Santiago testified that, because there was no reference to his race in the cartoon, he did not interpret its posting to be harassment on the basis of his race. *See* Pl.'s Ex. Vol. II (Santiago 12/30/1998 Dep.) at 135. As an Hispanic individual, however, he was offended by the cartoon. *See id.* at 136. Santiago testified that he did not report the cartoon to anyone within the Vineland Police Department. *See* Defs.' Ex. 52 (Santiago 12/30/1998 Dep. at 71).

A few weeks later, on February 14, 1996, Santiago was discharged from his job as a special law enforcement officer. The reasons for his discharge and the manner in which it occurred are disputed. According to the Defendants, in November, 1995, Sergeant Dennis D'Augostine and a colleague not a party to this suit met with a confidential informant, named, for purposes of this case, "Manny." "Manny" told the police officers that approximately one and one-half years before, in 1994, Santiago and his twin brother, Angel, who was also a special law enforcement officer for the City of Vineland, were involved in the drug operation of Freddy Oquendo, a person known to the detectives to be involved with drugs. *See* Defs.' Ex. 4 at 1–2. According to the intelligence report written by D'Augostine, "Manny" was a reliable informant, whose information had led to seventeen previous narcotic-related arrests. *See id.* at 1. According to the report, "Manny" stated that "he/she personally observed one of the Santiago brothers in possession of cocaine at Tony's Pizzeria" but that he did not know if either Santiago or his brother, at that point in time, continued to assist Freddy Oquendo in his drug operation. *Id.* at 1–2.

A few months later, on January 24, 1996, the same day Santiago was interviewed for the job of Vineland police officer, D'Augostine learned of Santiago's status as a police officer applicant and, according to the testimony of Sergeant Fresne and Chief Mario Brunetta, he informed both Fresne and Brunetta of the drug-related information he received concerning Santiago. *See* Defs.' Ex. 37 (John Fresne Dep.) at 48; Defs.' Ex. 41 (Mario Brunetta, Jr. Dep.) at 67–68. Brunetta testified that he directed D'Augostine to conduct an investigation to determine whether any additional information regarding Santiago's alleged narcotic involvement was available and to prepare a report. *See* Defs.' Ex. 41 at 71; *see also* Defs.' Ex. 8 (Vineland Police Dep't Memo from Capt. J.A. Martinez to Sgt. D'Augostine stating that Chief Brunetta directs D'Augostine to follow-up and attempt to substantiate the information).

According to D'Augostine's second report, dated February 16, 1996, at some point in the month of February, 1996,

D'Augostine and two other colleagues, not parties to this suit, met again with the confidential informant, "Manny." *See* Defs.' Ex. 5 at 1. According to the report, "Manny" told D'Augostine and others that while Santiago was a Vineland special law enforcement officer, he was in possession of cocaine and was present while numerous drug transactions occurred inside Tony's Pizzeria. *See id.* at 2. "Manny" reported, moreover, that he heard Santiago request cocaine from Freddy Oquendo and then state, after he received the narcotic, that he would return with the money. *See id.* "Manny" also allegedly stated that on another occasion, outside the Pizzeria, Santiago and "Tony," the alleged nephew of Freddy Oquendo, were seated in a Tony's Pizzeria delivery truck when Tony told "Manny" that they were going to deliver cocaine. *See id.* All of the reported events allegedly occurred one and one-half to two years before the date of the report; "Manny" had no current information on Santiago. *See id.* at 1.

According to the Defendants, on February 14, 1996, after receiving the updated information, Chief Brunetta, believing that Santiago was an "at will" employee, ordered Sergeant Letizia to discharge Santiago from his position as a special law enforcement officer with the City of Vineland. *See* Defs.' Ex. 41 at 78. According to the deposition testimony of Sergeant Letizia, he met with Santiago on February 14, 1996 and terminated Santiago's employment with the City of Vineland because certain "detrimental information" had surfaced regarding Santiago. *See* Defs.' Ex. 38 (Letizia Dep.) at 25–28. Santiago testified that, although Letizia told him that in the course of the background investigation it had been discovered that Santiago was involved in narcotics activity, Santiago already knew of the allegations, possibly because his brother, Angel Santiago, told him. *See* Defs.' Ex. 35 (Santiago Sept. 15, 1998 Dep.) at 79–80. According to the deposition testimony of Letizia, he informed Santiago that he was to contact Captain Martinez for further information. *See* Defs.' Ex. 38 (Letizia Dep.) at 26.

Later that same day, while Santiago stood on a street corner outside the police station, Chief Brunetta approached Santiago to explain the circumstances of Santiago's discharge. *See* Defs.' Ex. 35 (Santiago Sept. 15, 1998 Dep.) at 87; Defs.' Ex. 41 (Brunetta Dep.) at 78. In their brief conversation, Brunetta explained that he had made the determination to discharge Santiago based upon the narcotic information provided by Sergeant D'Augostine. *See* Defs.' Ex. 41 (Brunetta Dep.) at 79. Brunetta testified that while Santiago told Brunetta that the allegations were not true, Santiago was not afforded a formal hearing on the allegations that he was, at one time, involved in the sale of narcotics. *See id.* at 79, 81. Brunetta testified that neither he nor any officer at his direction asked Santiago to respond to the allegations against him. *See id.* at 78.

The following day, Santiago and his brother, Angel, met with Captain Martinez and Sergeant John Fresne regarding the termination, and surreptitiously tape-recorded the meeting. In this meeting, Santiago contends that Captain Martinez specifically stated that he would not "discuss the merit[s]" of the discharge. Pl.'s Br. at 17 (citing Defs.' Ex. 10 (Transcript of Meeting) at 2).

On February 23, 1996, the New Jersey Department of Personnel sent Santiago a Certification Disposition Notice informing him that his name had been removed from the Eligibles List because he had "failed to respond to the certification notice as required." Defs.' Ex. 16 at 1. In response, Santiago sent a letter of appeal, seeking reinstatement to the Eligibles List for the position of Vineland Police Officer. *See* Defs.' Ex. 17 at 1. In the letter, Santiago stated that:

I have received two notices of certification. The first one being August of 1995 at which time I responded to the notice stating that I was very much interested in the position. I then received a second

notice on [sic] January of 1996 for the same position, at which time I did not feel it was necessary to send a second letter of interest.

*Id.*

Approximately one month later, on April 8, 1996, Santiago filed a Charge of Discrimination with the Equal Employment Opportunity Commission, claiming that he had been discriminated against by the Vineland Police Department and Chief Mario Brunetta[, Jr.], solely on the basis of disability. *See* Defs.' Ex. 21 at 1. Specifically, Santiago claimed that the Vineland Police Department and Brunetta told him that he was "terminated and refused hire as a Police Officer because of an allegation of drug activity made by Respondent's Narcotic Unit." *Id.* Moreover, Santiago alleged that he was unlawfully discriminated against "based on a Perceived Disability" and "denies that he was ever involved in any drug activity and further alleges that despite his diligence and hard work he was terminated from same and refused hire as a Police Officer." *Id.*

That same week, Santiago was restored to the Eligibles List for the police officer position. *See* Defs.' Ex. 18 (dated April 15, 1996) at 1. On April 22, 1996, Santiago wrote to Mayor Joseph Romano, stating that he had been discharged from his position as a special law enforcement and animal control officer "without due cause" and seeking the Mayor's assistance in receiving information from the Vineland Police Department. *See* Defs.' Ex. 29 (Letter) at 1. Santiago testified that he sent a similar letter to John Gallo, the Director of Public Safety for the City of Vineland. *See* Pl.'s Ex. Vol I (Santiago 9/15/1998 Dep.) at 15.

According to the Defendants, approximately four months later, on August 1, 1996, a citizen, Robert Carr, who resided at 129 W. Linden Street in Clayton, New Jersey, reported to Sergeant John Fresne that he was aware that Santiago had applied to become a Vineland Police Officer and that Santiago had sold marijuana to students while in high school. *See* Defs.'

Ex. 6 (Vineland Intelligence Report) at 1; *see also* Defs.' Ex. 37 (Fresne Dep.) at 75. According to the report filed by Fresne, he confirmed that Carr worked with Santiago at the Sears, Roebuck and Co. ("Sears"), which was, at that time, Santiago's place of employment, and that Carr attended Vineland Senior High School with Santiago. *See* Defs.' Ex. 6 at 1; *see also* Defs.' Ex. 37 at 76. Since the date of the alleged statement, however, Carr has denied that he ever gave information to the police concerning Santiago's alleged involvement with marijuana while in high school. *See* Carr Aff. at ¶ 4 (dated July 15, 1999).

On August 1, 1996, Santiago placed second on the Eligibles List for the position of police officer of the City of Vineland. *See* Defs.' Ex. 19 (August 1, 1996 list) at 1. On August 13, 1996, Rudolph A. Luisi, the Director of Police, recommended five individuals other than Santiago for employment as Vineland police officers. *See* Defs.' Ex. 20 (Letter from Luisi, Director of Vineland Police, to Linda M. Dechen, Business Administrator, dated Aug. 13, 1996). In short, Santiago was bypassed.

The following week, the Vineland Police Department received information from two sources that Santiago was unlawfully carrying a handgun at his job as a security officer at Sears. A citizen, Wanda Wheeler, testified that she called the police department "[b]ecause [she] had a concern that [Santiago] had brought a gun into Sears and he often mentioned about [sic] having guns in the trunk of his car. I'm sorry, but to me that was a concern that an ordinary citizen was carrying around guns." Defs.' Ex. 42 (Wheeler Dep.) at 17. Sergeant D'Augostine testified that his second source was a confidential informant who "provided ... information that Luis Santiago was carrying a handgun inside Sears." Defs. Ex. 39 (D'Augostine Dep.) at 9; *see also* Defs.' Ex. 7 (police report) at 1. D'Augostine further testified that this confidential informant was "reliable" and "had been used in the past" to make arrests. Defs.' Ex. 39 at 9.

Aware that Santiago had filed discrimination charges against him and the Vineland Police Department, D'Augostine testified that he asked Internal Affairs Officer James Elliot to accompany him to Sears to document the event. *See id.* at 25–26; *see also* Defs.' Ex. 40 (Elliot Dep.) at 40–41.

At this point, the record contains two differing versions of the event. Interpreting the facts in the light most favorable to Santiago, what next transpired is as follows. Upon Santiago's exit from the Sears building, the police advised Santiago that they had received information that he was in possession of a handgun and they immediately informed him of his *Miranda* rights. *See* Defs.' Ex. 7 (police report) at 2 and *Miranda* form. After Santiago consented to a search of his car, the police found a Glock nine-millimeter handgun in the trunk of the car and ammunition in the passenger compartment. *See id.* at 2–3 and Consent to Search form. While Santiago possessed a valid permit for the purchase of the weapon, he did not have a permit to carry it. *See id.* at 2 and Permit to Purchase a Handgun & Form of Register. After the police determined that he was not taking the gun to a shooting range, a potentially exonerating exception for his failure to have a permit to carry such a weapon, the police transported Santiago to the Vineland police station and charged him with unlawful possession of a weapon, in violation of N.J.S.A. 2C:39–5(b). *See id.* at 3; *see also* Defs.' Ex. 40 (Elliot Dep.) at 40. Santiago was released on his own recognizance. *See id.* at 3. Subsequently, the case was presented to a grand jury, which did not return a true bill.

According to Santiago, the evidence against him was fabricated and/or coerced from witnesses in retaliation for an event that occurred nearly eight years ago, for the purpose of depriving Santiago of his employment. *See* Pl.'s Br. in Opp. to Mot. for Summ. J. at 8. According to Santiago, on September 19, 1992, a white resident of Vineland observed an Hispanic youth vandalizing his property. *See* Pl.'s Ex. Vol. I.

(Police Report Exs. to D'Augostine Dep.). A chase ensued, which was joined by two off-duty white police officers. *See id.* According to the reports, the chase and the eventual apprehension of the fleeing youth attracted a crowd of African–American and Hispanic residents. *See id.* At some point, a small riot broke out between the crowd of residents and the white officers and white residents. *See id.*

Sergeant D'Augostine was involved in the investigation of the incident. *See* Pl.'s Ex. Vol. I (D'Augostine 2/2/1999 Dep.) at 12. Santiago was a witness to the September 19, 1992 incident and, when questioned by D'Augostine about the events, he claims that he told D'Augostine that he did not want to give a statement. *See* Pl.'s Ex. Vol. II (Santiago 12/30/1998 Dep.) at 179. This Court notes that, at that time, Santiago already had applied to become a special law enforcement officer of the City of Vineland.

According to Santiago, D'Augostine threatened Santiago that if Santiago did not provide a statement, "[D'Augostine] was going to f——" him because D'Augostine was aware that Santiago aspired to be a Vineland Police Officer. *See id.* at 174–75. According to Santiago, he did in fact make a statement to the police. *See id.* Santiago testified that although he told the interviewing officers in his taped statement that he had not been coerced, he told two officers that if asked, he would testify that he was forced to provide information to the police. *See id.* at 178–79. Santiago further testified that he believed that his termination, the failure to hire, and subsequent arrest are, "to some ... extent," a result of D'Augostine's threat that "he was going to f——" Santiago, despite the fact that Santiago had little contact with D'Augostine in the years between 1992, the year of the Vineland uprising, and 1996, the year that Santiago was discharged from his position as a special law enforcement officer and bypassed for employment as a Vineland Police Officer. *See* Pl.'s Ex.

Vol. II (Santiago 12/20/1998 Dep.) at 175–78.

Following the relevant events in this case, Santiago surreptitiously tape-recorded conversations that he had with various police officers who refer to D'Augostine as a "treacherous motherf———." *See* Pl.'s Exs. Vol. I (Transcript of Conversation with T. Zatzariny) at 2. Santiago also claims that at the time the Vineland police received the information from "Manny," the confidential informant, he was under indictment for receiving stolen property, and therefore cannot be regarded as "reliable." *See* Pl.'s Exs. Vol. I (Certified Judgment of Conviction, dated March 11, 1996) at 1. "Manny" received a probationary sentence and was ordered to pay restitution. *See id.*[4]

On October 14, 1997, Santiago filed a Complaint in this Court, and, after seeking and receiving leave to file an amended complaint, filed an Amended Complaint on April 15, 1999. *See* Compl. (filed Oct. 14, 1997); Fourth Am. Scheduling Order (filed April 7, 1999); Am. Compl. (filed April 15, 1999). In his Amended Complaint, filed against the City of Vineland, Joseph Romano, the former Mayor of the City of Vineland, John P. Gallo, the former Director of Public Safety of the City of Vineland, Mario Brunetta, Jr., the Chief of Police of the City of Vineland, Paul Letizia, John Fresne, and Dennis D'Augostine, sergeants in the Vineland Police Department at all times relevant to the Amended Complaint, and John Does 1–50, Santiago alleges the following claims: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count One); (2) race discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* ("NJLAD")(Count Two); (3) deprivation of his rights under the First, Fourth,

Fifth, Sixth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988 (Count Three); (4) discrimination based upon a perceived disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.*, and the NJLAD (Count Four); (5) false arrest and malicious prosecution (Count Five); (6) retaliation in violation of Title VII, the ADA and the NJLAD (Count Six); (7) breach of contract (Count Seven); (8) intentional interference with his contractual relationship (Count Eight); and (9) the tort of "outrage" (Count Nine). The Defendants have moved for summary judgment of the entire Amended Complaint.

As will be apparent from the analysis set forth below, the task of this Court in deciding these motions for summary judgment was needlessly complicated by the appallingly poor quality of advocacy demonstrated by the attorneys in this case. Given the disarray of the moving and opposing papers submitted by counsel, this Court has struggled mightily to sort out the issues presented. The briefs are poorly written and poorly researched. Legal analysis is frequently absent. Instead, the Court has been presented with conclusory generalizations supported by intellectual laziness. Counsel have disserved their clients' interests, wasted the Court's time, and needlessly protracted these proceedings.

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

"On a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

---

4. Santiago also argues that there is evidence of document tampering in this case since a portion of Fresne's background investigation report is missing and the font of one of the page numbers appears to be different from the other page numbers. *See* Pl.'s Br. at ¶ 44.

The Court shall not entertain this contention since it is apparent that the updated investigation report, dated September 5, 1996 and identified as Defendants' Exhibit 3, corrects any error that might appear in the first report, dated September 15, 1995.

of law.'" *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "Any factual dispute invoked by the nonmoving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "In opposing summary judgment, a party 'must do more than simply show that there is some metaphysical doubt as to material facts,' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence." *Abraham*, 183 F.3d at 287. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Abraham*, 183 F.3d at 287. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham*, 183 F.3d at 287 (citing *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)). "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey*, 873 F.2d 17, 21 (1st Cir.1989)). Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed. R.Civ.P. 56(e); *see Anchorage Assocs.*, 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movants only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.*, 922 F.2d at 175.

## III. DISCUSSION

The Defendants raise a myriad of arguments in support of their motions for summary judgment. This Court shall address the two summary judgment motions in the following order: (A) Failure to Exhaust Administrative Remedies; (B) Santiago's Discrimination Claims on Grounds of Race, Disability and Retaliation; (C) 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986 and 1988; (D) False Arrest; (E) Malicious Prosecution; (F) Common Law Breach of Contract and Intentional Interference with Contractual Relationship; (G) The Tort of "Outrage;" and (H) Santiago's Claims for Punitive Damages.

### A. Failure to Exhaust Administrative Remedies: Title VII

In support of their motions for summary judgment, the Defendants first contend that Santiago failed to exhaust his administrative remedies with respect to his claim of race discrimination under Title VII of the Civil Rights Act of 1964. Specifically, the Defendants argue that Santiago failed to submit his claim first to the Equal Employment Opportunity Commission, in violation of 42 U.S.C. § 2000e–5 (1994). Because Santiago failed to oppose the motions for summary judgment on this ground, I shall grant summary judgment, with respect to Santiago's Title VII race discrimination claim, only if "appropriate." *See* Fed. R. Civ. P. 56(e).[5]

---

**5.** Federal Rule of Civil Procedure 56(e) provides, in relevant part, that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but

Before instituting an action under Title VII, a plaintiff must timely file his claim with the EEOC and obtain a right to sue letter from the agency. *See* 42 U.S.C. § 2000e–5 (1994). Such conditions precedent are statutory, rather than jurisdictional, prerequisites, comparable to a statute of limitations. *See Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Anjelino v. The New York Times Co.,* 200 F.3d 73, 87 (3d Cir.1999). Accordingly, claims under Title VII can be dismissed for failure to exhaust such administrative remedies. *See Anjelino,* 200 F.3d at 87–88; *Knoll v. Springfield Township Sch. Dist.,* 699 F.2d 137, 145 (3d Cir.1983), *vacated on other grounds,* 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985).

A plaintiff is excused from exhausting his administrative remedies when "the acts alleged in the subsequent . . . suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir.1996)(quoting *Waiters v. Parsons,* 729 F.2d 233, 237 (3d Cir.1984)(per curiam)); *see also Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984)(quoting *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–99 (3d Cir.1976)).

In this case, Santiago filed a charge of disability discrimination with the EEOC alleging that the City of Vineland Police Department and Chief Mario Brunetta, Jr. discriminated against him, by terminating his employment as a special law enforcement officer and refusing to hire him as a police officer, based upon his "[p]erceived [d]isability" of drug involvement. Defs.' Ex. 21 at 1. In his Amended Complaint, however, Santiago alleged, among other things, a claim of race discrimination under Title VII.

It is clear that Santiago is not excused from exhausting his administrative remedies with respect to his claim under Title VII because his race discrimination claim is not within the scope of either the EEOC charge or its reasonable investigation. In *Waiters v. Parsons,* 729 F.2d 233 (3d Cir. 1984), the appellant filed a general charge of retaliation with the EEOC and, following her termination, subsequently alleged retaliatory discharge before the District Court. *See id.* at 235–36. The District Court dismissed the appellant's complaint because she had failed first to file the retaliatory discharge claim with the EEOC. *See id.* at 236. The Court of Appeals for the Third Circuit reversed, holding that the appellant's suit was not barred for failure to exhaust administrative remedies because both "the core grievance—retaliation—is the same" and, based upon the evidence in the record, the retaliatory discharge claim had, in fact, fallen within the scope of the EEOC's investigation. *See id.* at 238.

Subsequently, in *Antol v. Perry,* 82 F.3d 1291 (3d Cir.1996), the Third Circuit distinguished *Waiters,* holding that an employee's gender discrimination claim was not subsumed within the appellant's EEOC complaint based upon disability discrimination. *See id.* at 1295. In so finding, the Court rejected the appellant's argument that the disability charge encompassed the gender claim because an EEOC investigation would have revealed the gender issues. *See id.* at 1296. The Court held that "[t]he investigation focused, quite properly . . . on the gravamen of [appellant's] complaint—disability discrimination. Neither the EEOC nor the [appellee] were put on notice of a gender discrimination claim." *Id.*

Like the Court in *Antol,* I find that Santiago's Title VII claim is not within the scope of his previously filed disability dis-

the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

crimination charge or "the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 966–67 (3d Cir.1978)(quoting *Ostapowicz,* 541 F.2d at 398–99); *see also Robinson v. Dalton,* 107 F.3d 1018, 1025–26 (3d Cir.1997). Quite simply, the facts associated with Santiago's racial identity are separate and distinct from those associated with his "perceived disability" based upon his alleged involvement with drugs. In addition, there are no allegations set forth in the charge that would put the EEOC on notice that Santiago was also the victim of discrimination based upon his race. Santiago checked only the "Disability" box on the EEOC charge and his allegations refer only to discrimination based upon a "[p]erceived [d]isability." *See* Defs.' Ex. 21; *see also Mullen v. Topper's Salon and Health Spa, Inc.,* 99 F.Supp.2d 553, 556 (E.D.Pa.2000). Consequently, a reasonable EEOC investigation would not have included Santiago's Title VII claim. Accordingly, I find that Santiago failed to exhaust his administrative remedies with respect to his Title VII claim and, therefore, I shall grant summary judgment on Count I of the Amended Complaint.[6]

### B. Santiago's Discrimination Claims on Grounds of Race, Disability and Retaliation

Turning now to the merits of the Amended Complaint, Santiago alleges that his discharge and the Defendants' continued refusal to hire him as a Vineland Police Officer violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1981 and 1983, and the New Jersey Law Against Discrimination ("NJLAD") because the actions of the Defendants were impermissibly predicated upon his race, a perceived disability, and were in retaliation for Santiago's act of filing a charge of discrimination with the EEOC.

As a preliminary matter, the legal analysis governing claims of discriminatory treatment in the employment context under these federal and state statutes is the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). *See Shaner v. Synthes (USA),* 204 F.3d 494, 500 (3d Cir.2000)(finding the Title VII *McDonnell Douglas* burden-shifting rules applicable in the ADA context); *Stewart v. Rutgers, The State University,* 120 F.3d 426, 432 (3d Cir.1997)(citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989))(finding *McDonnell Douglas–Burdine* framework applicable to claims under 42 U.S.C. §§ 1981 and 1983); *Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 70 (3d Cir.1996)(stating that the same standards and burdens of proof are applicable to NJLAD claims as are applicable

---

**6.** The Defendants did not contend, in support of their motions for summary judgment, that Santiago failed to exhaust his administrative remedies with respect to his Americans with Disabilities Act claim and his retaliation claim. Because the exhaustion requirement is comparable to a statute of limitations, *see Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Anjelino v. The New York Times Co.,* 200 F.3d 73, 87 (3d Cir.1999), I find that the arguments are now waived. *See Commonwealth of Pennsylvania Dep't of Public Welfare v. United States Dep't of Health and Human* Servs., 101 F.3d 939, 945 (3d Cir.1996)(citing *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir.)("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue ... will not suffice to bring that issue before this court.' "(citation omitted)(ellipsis in original)), *cert. denied,* 513 U.S. 946, 115 S.Ct. 356, 130 L.Ed.2d 311 (1994)); *Bowden v, United States,* 106 F.3d 433, (D.C.Cir.1997)(finding that federal agency waived argument that appellant failed to exhaust administrative remedies when it responded to merits of complaint without ever questioning its timeliness).

to ADA claims); *Cinelli v. U.S. Energy Partners,* 77 F.Supp.2d 566, 573 (D.N.J.1999)(Simandle, J.)(applying framework to claims under ADA and NJLAD); *Mogull v. CB Commercial Real Estate Group, Inc.,* 162 N.J. 449, 462, 744 A.2d 1186 (2000)(citing *Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 389 A.2d 465 (1978))(finding framework applicable to claims under NJLAD).

Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case either by providing direct evidence of intentional discrimination or circumstantial evidence that would raise the inference that the defendant's conduct was motivated by discriminatory animus. *See Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207; *see also, Reeves v. Sanderson Plumbing Prods., Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). Generally, to establish a *prima facie* case, the plaintiff must demonstrate that he: (1) belongs to a protected class; (2) was qualified for the position; (3) was fired or not offered the job; and (4) was replaced by a person outside the protected group. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742, 125 L.Ed.2d 407.

Once the *prima facie* case has been established, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *See Reeves,* 120 S.Ct. at 2106 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089). This burden is one of production, not persuasion. *See id.* (citing *Hicks,* 509 U.S. at 509, 113 S.Ct. 2742). The defendant satisfies this burden by introducing evidence which, taken as true, would permit a trier of fact to conclude that unlawful discrimination was not the reason for the discharge or the failure to hire. *See Burdine,* at 254–56, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207. It is noteworthy that the defendant need not prove that the proffered reason actually motivated its conduct. *See id.* Rather, the evidence submitted by the defendant need only raise a genuine issue of material fact as to whether it discriminated against the plaintiff. *See id.* at 254 n. 7, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

If the defendant is successful in meeting this light burden, the burden then rebounds to the plaintiff to prove, by a preponderance of the evidence, that the defendant's proffered explanation is a pretext for discrimination. *See Hicks,* 509 U.S. at 507–508, 113 S.Ct. 2742, 125 L.Ed.2d 407; *see also Reeves,* 120 S.Ct. at 2106. "[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets the burden of production . . . the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves,* 120 S.Ct. at 2106 (quoting *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742; *Burdine,* 450 U.S. at 255, n. 10, 101 S.Ct. 1089). The plaintiff must convince the factfinder "'both that the reason was false, and that discrimination was the real reason.'" *Shaner,* 204 F.3d at 501 (quoting *Jones v. School Dist. Of Philadelphia,* 198 F.3d 403, 412–13 (3d Cir.1999)(internal citations omitted)). The Court of Appeals for the Third Circuit has held that to discredit the employer's proffered reason:

> [T]he plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employee's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Id.* (quoting *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994)(internal citations omitted)). With this general standard in mind, I shall now turn to Santiago's individual claims.

1. *Race Discrimination under 42 U.S.C. §§ 1981 and 1983 and the New Jersey Law Against Discrimination ("NJLAD")*

In Counts Two and Three of the Amended Complaint, Santiago alleges that he was discharged as a special law enforcement officer and bypassed for employment as a Vineland Police Officer on the basis of his race, in violation of 42 U.S.C. §§ 1981 [7] and 1983 [8] and the NJLAD. Recognizing that the burden-shifting analysis of *McDonnell Douglas* and its progeny govern this aspect of Santiago's case, the Defendants contend, in their motions for summary judgment, that Santiago cannot establish a *prima facie* case of discrimination because he was not qualified for the position of Police Officer. The Defendants also contend that even if Santiago is able to establish a *prima facie* case, there are legitimate, nondiscrimina-

tory reasons for Santiago's discharge and bypass, including reliance on New Jersey's employee selection administrative rule, the "Rule of Three." Finally, the Defendants argue that Santiago is unable to establish the necessary "pretext" to survive the motions for summary judgment. The Defendants also raise qualified immunity and various liability arguments. In opposition to the motions for summary judgment, Santiago first contends that he was indeed qualified for the position considering, among other things, his inclusion in the Eligibles List. Conceding that the Defendants can satisfy the second prong of the burden-shifting analysis, Santiago also contends that the Defendants' legitimate, nondiscriminatory reasons for the termination and bypass are pretext for discrimination. For the reasons set forth below, I find that genuine issues of material fact exist on both whether Santiago was "qualified" and whether the Defendants' legitimate, nondiscriminatory reasons for the termination and failure to hire were pretext for discrimination. I shall, however, grant in part the Defendants' motions for

7. Section 1981 provides that:

 (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

 (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

 (c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (1994). To sustain a claim under section 1981, a plaintiff must establish that: (1) he is a member of a racial minority; (2) the defendant intended to discriminate

against him on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981, i.e., the making of enforcing of a contract. *See Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996). In this case, the Defendants do not dispute the existence of a contractual relationship between Santiago and the City of Vineland. Interpreting the facts in the light most favorable to the plaintiff on these motions for summary judgment, I shall assume the existence of a contractual relationship for purposes of Santiago's 42 U.S.C. § 1981 claims.

8. 42 U.S.C. § 1983 provides, in pertinent part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

summary judgment on Santiago's race discrimination claims on liability grounds.

### a. The Prima Facie Case Analysis: Was Santiago "Qualified?"

Under the *McDonnell Douglas* burden-shifting standard, as set forth above, Santiago has the initial burden of establishing, by a preponderance of the evidence, a *prima facie* case of discrimination. To do so, the plaintiff must demonstrate, among other things, that he was qualified for the position. In this case, the Defendants only contend that Santiago is unable to establish that he was qualified for the position of Vineland Police Officer because: (1) Santiago's inclusion in the Eligibles List did not bestow upon Santiago a right to the position of Police Officer; and (2) the psychological report by Cumberland County rendered Santiago "unqualified" for the position.[9] Santiago contends, on the other hand, that he was qualified because he met the New Jersey Civil Service requirements, maintained a clean criminal record, was of good character, and had been reappointed a number of times as a special law enforcement officer for the City of Vineland.

In analyzing whether Santiago was qualified for the position of a Vineland Police Officer, this Court "must confine its inquiry to the objective qualifications related to the position of police officer." *Watson v. City of Salem,* 934 F.Supp. 643, 654 (D.N.J.1995)(Simandle, J.)(citing *Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 523 (3d Cir.1992)); *see also Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir.1995)("'[w]hile objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality ... should be better left to' consideration of whether the employer's nondiscriminatory reason for dis-

charge is pretext")(quoting *Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir. 1990)).

This Court finds it incredible that neither party cites to N.J.S.A. 40A:14–122 (West 1993), entitled "General qualifications of members of the police department and force; temporary appointments; absences from duty," which provides that:

> Except as otherwise provided by law, no person shall be appointed as a member of the police department and force, unless he:
>
> (1) is a citizen of the United States;
>
> (2) is sound in body and of good health sufficient to satisfy the board of trustees of the police and firemen's retirement system of New Jersey as to his eligibility for membership in the retirement system;
>
> (3) is able to read, write and speak the English language well and intelligently;
>
> (4) is of good moral character, and has not been convicted of any criminal offense involving moral turpitude ....

*Id.; see also Watson v. City of Salem,* 934 F.Supp. 643, 654–55 (D.N.J.1995)(Simandle, J.).

In this case, I find that Santiago has at least raised a genuine issue of material fact that he is qualified. The summary judgment record reveals that Santiago is a citizen of the United States, *see* Pl.'s Ex. Vol. I (special law enforcement officer application) at 1 (stating that Santiago was born in Vineland, New Jersey), and that he has a clean criminal record, *see* Defs.' Ex. 2 at 4; Defs.' Ex. 3 at 4. Santiago asserts, and the Defendants do not dispute, that he has a good general character. *See* Pl.'s Br. at 24–25. In addition, it is not disputed in this case that Santiago is not profi-

---

**9.** The Defendants do not contend that Santiago is unable to establish a *prima facie* case of discrimination with respect to his discharge. I therefore shall assume, for purposes of these motions, that the Defendants concede that Santiago is able to carry his initial burden on his discharge discrimination claim.

cient in the English language or that he is not physically fit.

While the Defendants are correct that the mere inclusion of a candidate's name on the Eligibles List does not confer upon him a vested right to employment, *see In re Crowley,* 193 N.J.Super. 197, 210, 473 A.2d 90 (App.Div.1984); *see also Nunan v. New Jersey Dep't of Personnel,* 244 N.J.Super. 494, 497–98, 582 A.2d 1266 (App.Div.1990), a candidate's right to employment is separate and distinct from the issue of whether, for purposes of a discrimination claim under 42 U.S.C. §§ 1981 and 1983 and the NJLAD, a candidate was "qualified" for the position. In fact, while this Court does not view the regulations as dispositive of the issue of Santiago's status as a "qualified" applicant, the New Jersey Administrative Code defines "Eligible list" as "a roster compiled or approved by the Department of Personnel of *persons who are qualified for employment* or reemployment." N.J. Admin. Code tit. 4A, § 1–1.3 (Supp.1998)(emphasis added).

Instead of contending that Santiago was not qualified for the position of Vineland Police Officer under one of the requirements set forth in N.J.S.A. 40A:14–122, the Defendants assert that Santiago was psychologically unqualified. They have failed, however, to alert this Court to any mental fitness requirement for municipal police officers analogous to that of applicants for the position of state police officer. *See* N.J.S.A. 53:1–9 (providing that "[n]o one shall be appointed [to be a member of the State Police] who has not applied for and taken an examination to the satisfaction of the superintendent, evidence of his mental and physical fitness and ability to perform the duties of a member of the State Police"); *see also State v. State Troopers Fraternal Ass'n,* 134 N.J. 393, 415, 634 A.2d 478 (1993)("[u]nlike police officers in municipalities subject to Civil Service whose appointment and promotions are governed by the merit-appointment pro-

cess, *see* N.J.S.A. 11A:4–1 to –16 and N.J.S.A. 40A:14–122.4, applicants for appointments to the State Police are required to establish to the satisfaction of the Superintendent their mental and physical fitness and general qualifications").

In fact, although neither party so argued, the State regulations governing this case provide that an appointing authority [10] has the *discretion* to require all of the eligibles to undergo a medical or psychological exam. *See* N.J. Admin. Code tit. 4A, § 4–6.5 (Supp.1998). If that discretion is exercised, the appointing authority may only require such exams after an offer of employment has been made and prior to appointment, and may, if it so chooses, condition the offer on the results of the examination. *See id.* The appointing authority must then follow an intricate procedure to compel the New Jersey Department of Personnel to remove a candidate's name from the Eligibles List for reasons of medical or psychological disqualification. *See id.* In this case, neither party provides any evidence that the City of Vineland required psychological exams for all of the candidates named on the Eligibles List and in fact, Sergeant Fresne, in drafting Santiago's background investigation report, relied on a psychological report conducted not in connection with Santiago's current application but in connection with his application with the Cumberland County Sheriff's Department.

Confining my inquiry then to the "objective qualifications related to the position of police officer" as set forth in N.J.S.A. 40A:14–122 (West 1993), I find that Santiago has sufficiently raised a genuine issue of material fact that he was qualified for the position of Vineland Police Officer.

b. The Defendants' Legitimate, Nondiscriminatory Reasons

 Under the *McDonnell Douglas* burden-shifting standard, I must determine next if the Defendants have raised

---

**10.** N.J. Admin. Code tit 4A, § 1–1.3 (Supp. 1998) defines "Appointing authority" as "a

person or group of persons having power of appointment or removal."

legitimate, nondiscriminatory reasons for Santiago's discharge and bypass. The Defendants have raised only one argument in support of Santiago's discharge, namely, that a confidential informant named "Manny" reported that Santiago had in the past sold illegal drugs. In addition to that argument, the Defendants raise three others as nondiscriminatory reasons for their bypass of Santiago for hire as a Police Officer: (1) New Jersey's "Rule of Three," *see* N.J.S.A. 11A:4–8 (West 1993); N.J. Admin. Code tit. 4A, § 4–4.8(a)(3)(Supp.1999),[11] bestows upon the Vineland Police Department the discretion to select one individual among the top three available and therefore, the bypass of Santiago was legitimate; (2) citizen Robert Carr came forward with a statement that Santiago had sold drugs in high school; and, (3) based upon the background investigation he conducted, Sergeant Fresne did not recommend Santiago for employment as a Police Officer. *See* Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs. City of Vineland, Joseph Romano and John Gallo at 24; *see also* Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs. Brunetta, Letizia, Fresne and D'Augostines [sic] at 13.[12] Because Santiago has conceded, for purposes of these motions, that the Defendants have stated legitimate, nondiscriminatory reasons for the discharge and bypass, I need not address whether the Defendants have met their relatively light burden. Moving then to the heart of this inquiry, for the reasons set forth below, I find that Santiago has sufficiently raised a genuine issue of material fact that the legitimate, nondiscrimi-

natory reasons for his discharge and bypass are pretext for discrimination.

### c. Pretext for Discrimination

As set forth above, at the pretext stage of the *McDonnell Douglas* analysis, Santiago must establish that a genuine issues of material fact exists that the Defendants' proffered reasons for the discharge and failure to hire are false or that discrimination was more likely than not the real reason. To discredit such reasons:

> [T]he plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employee's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir.2000)(quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994)(internal citations omitted)). In short, I find that Santiago has raised genuine issues of material fact such that a rational factfinder could find all of the Defendants' proffered reasons "unworthy of credence." *Id.*

### i. The Narcotics Allegations

In an effort to raise a genuine issue of material fact as to the information con-

---

**11.** In attempting to cite to the "Rule of Three," the Defendants incorrectly cite to the regulation governing the issuance of a certification by the New Jersey Department of Personnel, N.J. Admin. Code tit. 4A, § 4–4.2 (Supp.1998). This Court notes that the statute and regulations governing New Jersey's "Rule of Three" are located at N.J.S.A. 11A:4–8 (West 1993) and N.J. Admin. Code tit. 4A, § 4–4.8(a)(3)(Supp.1999).

**12.** Defendants City of Vineland, Joseph Romano and John Gallo also add the proposition that "[a]dditional corroboration as to the wisdom of the judgment in not hiring plaintiff is seen in plaintiff's conduct in the August 21, 1996 gun arrest." Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs [sic] City of Vineland, Joseph Romano and John Gallo at 25. Quite obviously, the Defendants cannot rely on the occurrence of a future event to justify an employee's discharge and failure to hire.

cerning his alleged involvement in Freddy Oquendo's drug operation, Santiago contends that the information was inherently unreliable because: (1) defendant D'Augostine was a dishonest police officer who fabricated the allegations; and, (2) the confidential informant, "Manny," was under indictment at the time of his report, was anxious to please D'Augostine because he was receiving threats involving his status as a confidential informant, and whose unreliability is apparent by his untruthful deposition testimony. This Court shall address these arguments in turn.

First, Santiago relies on three pieces of inadmissible hearsay for his contention that D'Augostine is dishonest: (1) officer Timothy Zatzariny told Santiago that D'Augostine was a "treacherous motherer——er," Pl.'s Ex. Vol. I (Transcript of Conversation between Santiago and T. Zatzariny) at 2; (2) officer Edgar Zatzariny told Santiago that unnamed superiors were "[f]—ing with a guy's career when it's not true," Pl.'s Ex. Vol. I (Transcript of Conversation between Santiago and E. Zatzariny) at 1; and (3) officer Frank Lopergolo told Santiago that at some point in time, D'Augostine had unlawfully planted evidence during a drug raid, see Pl.'s Ex. Vol. II (Santiago 12/20/1998 Dep.) at 180–182. Simply stated, this supposed "evidence" is insufficient to establish pretext in this case because this Court may rely only on evidence admissible at trial. See Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir.1995)(stating that summary judgment is appropriate when "admissible evidence" fails to demonstrate the existence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law); Williams v. Borough of West Chester, Pennsylvania, 891 F.2d 458, 466 n. 12 (3d Cir.1989). In this case, the three statements are inadmissible hearsay.

Santiago next argues that evidence of certain investigatory techniques employed by D'Augostine raises a genuine issue of fact that D'Augostine fabricated the drug allegations against him. For example, Santiago submits the affidavit of James Sinclair, who stated that D'Augostine contacted him and solicited negative information on Santiago, see Sinclair Aff. at ¶ 4, and the affidavits of Robin Lynn Carney and Freddy Oquendo who state that at some point in December, 1998, D'Augostine told Oquendo that, in exchange for information on Santiago, D'Augostine would ensure that traffic charges pending against Oquendo were dismissed. See Oquendo Aff. at ¶ 4; see also Carney Aff. at ¶ 6.

The summary judgment record in this case reflects that before Santiago's discharge, defendant Brunetta ordered D'Augostine to attempt to update the drug allegations made against Santiago by the informant, "Manny." See Defs.' Ex. 41 at 71; Defs.' Ex. 8. In light of Brunetta's order, therefore, D'Augostine's interview of Sinclair, who was Santiago's supervisor at Sears, was reasonable.

However, D'Augostine's contact with Carney and Oquendo in December, 1998, which was during the discovery phase of this case, is sufficient to raise a genuine issue of material fact. In its base form, the argument made by Santiago is that D'Augostine fabricated the allegations against him. The two sworn affidavits reveal that during the discovery phase of this case, a named party to the lawsuit promised immunity from the enforcement of State laws in exchange for detrimental information concerning the plaintiff, without justification. See Carney Aff. at 6; Oquendo Aff. at 4. Santiago therefore has raised a genuine issue of material fact as to whether the Defendants' proffered reason for his discharge and bypass, reliance on the confidential informant report, was pretext for discrimination. Specifically, this inconsistency, as well as the others set forth below, could lead a reasonable factfinder to conclude that D'Augostine fabricated the drug allegations against Santiago and to infer that the drug allegations were unworthy of credence.

Santiago also contends that "Manny" was not a reliable confidential informant because he was under indictment for a crime at the time he allegedly reported the information concerning Santiago to D'Augostine. In support of this contention, Santiago submits the judgment of conviction of "Manny," [13] which provides that following his December 4, 1994 arrest, on April 6, 1995, he was indicted and pled not guilty to theft, in violation of N.J.S.A. 2C:20–3, and criminal attempt, in violation of N.J.S.A. 2C:5–1. *See* Pl.'s Ex. Vol. I (Judgment of Conviction) at 1. On March 11, 1996, "Manny" entered a guilty plea and was convicted of receiving stolen property, in violation of N.J.S.A. 2C:20–7. *See id.* In response, the Defendants simply state that the fact that "Manny" had a criminal record "comes as no surprise to anyone involved who has dealt with confidential informants connected to the drug world." Reply Br. on behalf of Defs. City of Vineland, Joseph Romano and John Gallo at 7.

This "common thread" of criminal activity among informants does not negate the fact that, at the time "Manny" provided the information involving Santiago to D'Augostine, he was under indictment for a State crime. It follows then that "Manny's" otherwise established veracity would reasonably be called into question: was "Manny's" motive in reporting two-year-old drug allegations to win immunity from prosecution? Did D'Augostine know of "Manny's" indictment? Clearly, these are questions this Court cannot answer at this phase of the litigation. Clearly, then, genuine issues of material fact exist with respect to whether the Defendants' reliance on "Manny's" tip that Santiago had been involved in Freddy Oquendo's drug operation was a pretext for discrimination.

ii. New Jersey's Rule of Three

The Defendants also contend that Santiago does not have a cause of action for the bypass because the hiring process of August 1, 1996 conformed to the New Jersey administrative "Rule of Three." Under that Rule, "a certification that contains the names of at least three interested eligibles shall be complete and a regular appointment shall be made among these eligibles." N.J.S.A. 11A:4–8 (West 1993); *see also* N.J.A.C. 4A:4–4.8(a)(3) (Supp.1999).[14] In their exhibits filed in support of their motions, the Defendants submit the August 1, 1996 Eligibles List, which ranks the relevant candidates as: (1) Stephen M. Cesare; (2) Luis A. Santiago; (3) Hector L. Nieves; (4) Robert P. Stanker, II; and (5) John E. Cornish. *See* Defs.' Ex. 19. By letter dated August 13, 1996, Rudolph A. Luisi, the Director of Police, recommended to the Business Administrator of the City of Vineland that the City hire as police officers Robert P. Stanker, John E. Cornish, and three other individuals listed on the Eligibles List. *See* Defs.' Ex. 20. In

---

**13.** In their reply brief, defendants City of Vineland, Joseph Romano and John Gallo concede that the confidential informant "Manny" had a criminal record and cite to the submitted judgment of conviction. For purposes of these motions, then, I shall assume that the person named in the judgment of conviction and "Manny" are one and the same.

**14.** N.J.A.C. 4A:4–8 provides, in relevant part:
(a) Upon receipt of a certification, an appointing authority shall take whichever of the following actions is appropriate when a permanent appointment is to be made:
1. Appoint the eligible whose name has been certified from the special reemployment list;

2. Appoint the eligible whose name has been certified from regular or police or fire employment lists; or
3. Appoint one of the top three interested eligibles (rule of three) from an open competitive or promotional list, provided that:
i. Disabled veterans and then veterans shall be appointed in their order or ranking from an open competitive list;
ii. If the eligible who ranks first on a promotional list is a veteran, then a non-veteran may not be appointed; and
iii. See N.J.A.C. 4A:4–2.15(i) for tie scores.
*Id.* at 4A:4–4.8(a).

effect, none of the top three candidates on the Eligibles List was recommended for hire.

Unlike the evidence explaining the recommendations made from the January 22, 1996 Eligibles List, there is no evidence in the record providing any justification for the possible violation of the Rule of Three. *See, e.g.,* Defs.' Ex. 15 at 1 (finding that, in accordance with the Rule of Three, Candidate 1 was bypassed, Candidates 2–4 did not respond to the Certification Notice, Candidate 5 was bypassed, Candidates 6–7 did not respond, and therefore Candidate 8 was hired). Without any evidence to support the appointing authority's possibly legitimate bypass of the top three candidates on the August 1, 1996 Eligibles List, I find that there is a genuine issue of material fact as to whether the conduct of the Defendants conformed to the Rule of Three.

### iii. Robert Carr

Next, the Defendants assert that on August 1, 1996, Robert Carr, who resided at 129 W. Linden Street in Clayton, New Jersey, reported to defendant Fresne that he was aware that Santiago had applied to become a Vineland Police Officer and that Santiago had sold marijuana to students while he was in high school. *See* Defs.' Ex. 6 at 1; Defs.' Ex. 37 at 75. According to Fresne, he confirmed that Carr worked with Santiago at Sears and also that Carr attended Vineland Senior High School with Santiago. *See* Defs.' Ex. 6 at 1; *see also* Defs.' Ex. 37 at 75. In support of his argument that the Defendants' proffered reasons for his bypass are pretext for discrimination, Santiago submits the affidavit

of Robert Carr, Jr., wherein Carr denied "ever meeting with an officer from the Vineland Police Department ... [or] providing information that Luis Santiago, who I attended high school with, sold marijuana." Aff. of Robert Carr, Jr. at ¶ 4. Robert Carr, Jr. states that he presently resides at the same address as was given to defendant Fresne by a "Robert Carr," attended Vineland High School with Santiago and worked with Santiago for a period of time at Sears. Because there is sufficient evidence to infer, for purposes of these motions, that the citizen informant named Robert Carr and the affiant are the same person, I find that Santiago has raised a genuine issue of material fact that the Defendants' proffered reliance on the statement of Robert Carr is a pretext for discrimination.[15]

### iv. The Negative Recommendation

Finally, in response to the Defendants' reliance on Sergeant Fresne's negative recommendation for hire, Santiago argues that the background investigation conducted by Fresne was faulty in many respects. I find that Santiago's purported evidence of impropriety all fail to rise to the level of a genuine issue of material fact. In sum, the Defendants' proffered reason that it relied on the negative recommendation of Sergeant Fresne, which he set forth in his report of Santiago's background, was a legitimate, nondiscriminatory reason for the City of Vineland's bypass of Santiago for the position of Police Officer.[16]

In *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994), the United States Court of Appeals for the Third Circuit held that to

---

**15.** In his deposition testimony, taken before Mr. Carr provided his affidavit, on either September 15, 1998 or December 20, 1998, Santiago states that he did not believe defendant Fresne fabricated the information allegedly garnered from Robert Carr. *See* Defs.' Ex. 53 at 190. This Court does not view this as inherently inconsistent with Carr's affidavit, which was sworn on the later date of July 15, 1999, presumably after further discovery had occurred in this case. Accordingly, I find that Santiago's deposition statement further supports this Court's view that Santiago has

raised a genuine issue of material fact as to the Defendants' reliance on the statement of Robert Carr.

**16.** This Court understands the Defendants as contending that they relied upon Sergeant Fresne's September 18, 1995 report, *see* Defs.' Ex. 2, since Fresne's September 5, 1996 updated report would not have been written at the time of Santiago's August, 1996 bypass. *See* Defs.' Ex. 3.

survive summary judgment on a claim under the *McDonnell Douglas* framework, a plaintiff "generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 762. The Court was explicit, however, that in certain circumstances, a plaintiff need not refute every single proffered reason of the defendant:

> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

*Id.* at 764 n. 7.

This Court is satisfied that the *Fuentes* rationale is applicable in this case. In response to the Defendants' four proffered reasons, Santiago has sufficiently cast doubt on three of the alleged nondiscriminatory reasons, enough that this Court finds that he need not discredit the Defendants' reliance on Sergeant Fresne's negative recommendation. In short, I find that, in light of the genuine issues of material fact that have been raised by Santiago with respect to his discrimination claims, a reasonable factfinder could discredit the Defendants' reliance on the negative recommendation. Accordingly, I find that, at this stage, Santiago has demonstrated the existence of genuine issues of material fact sufficient to withstand summary judgment

on the discrimination claims asserted under 42 U.S.C. §§ 1981 and 1983 and the NJLAD, as set forth in Counts Two and Three of the Amended Complaint.

### d. Liability of the Defendants

Next, the City of Vineland and the individual defendants set forth various arguments with respect to their liability in support of summary judgment on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD. I shall address the arguments raised under the federal and state statutes separately, and with respect to each defendant.

### i. Race Discrimination in violation of 42 U.S.C. §§ 1981 and 1983

The Defendants assert three main arguments in support of summary judgment on Santiago's claims for race discrimination under 42 U.S.C. §§ 1981 and 1983:(1) Santiago has not alleged that the City of Vineland acted pursuant to a discriminatory policy or custom and therefore it cannot be liable; (2) section 1981 does not support individual liability; and (3) individual defendants Romano and Gallo had no personal involvement in Santiago's case and therefore cannot be liable. In opposition to these arguments, Santiago contends that: (1) the City of Vineland maintained a custom and practice that "makes it more difficult for Hispanic officers to obtain employment and maintain such employment after obtained," Pl.'s Br. at 42, and the City is liable pursuant to the acts of defendant Brunetta, a final policymaker; (2) individuals can be liable under section 1981; and (3) the personal involvement of defendants Romano and Gallo, which subjects them to liability under section 1981, is evidenced by the letters they received from Santiago.

### (a) The City of Vineland

■ Under section 1983, a municipality may be liable only when the constitutional deprivation results from an official policy or custom. *See Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611

(1978); *see also Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 791 (3d Cir. 2000). The same policy or custom requirement is necessary to subject a municipality to liability under section 1981. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Smith v. Chicago Sch. Reform Bd. of Trustees*, 165 F.3d 1142, 1148 (7th Cir. 1999); *Meachum v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 42 F.Supp.2d 533, 539 n. 7 (E.D.Pa.1999); *Reynolds v. Borough of Avalon*, 799 F.Supp. 442, 444 n. 1 (D.N.J.1992)(Gerry, C.J.).

In this case, Santiago alleges first that the City of Vineland maintains a practice that "makes it more difficult for Hispanic officers to obtain employment and maintain such employment after obtained." Pl.'s Br. at 42. The only example contained in Santiago's brief, although not specifically cited in support of his argument that the City of Vineland maintained a policy or custom of discrimination, is the case of Nicholas Borrero, an Hispanic individual, who, according to Santiago, was listed as the first candidate on the Eligibles List and bypassed. *See* Pl.'s Br. at 14–15. According to the deposition testimony of defendant Brunetta, he did not recommend Borrero for a position within the department because "to some degree [Borrero] falsified the application," but Borrero subsequently was offered a job by the appointing authority. *See* Pl.'s Ex. Vol. II (Brunetta Dep.) at 54, 66. Because Santiago points to a decision made by Brunetta in another case, the City of Vineland can only be liable on this ground if Brunetta is found to be a final policymaker of the City. In support of his conclusory contention that Brunetta is a final policymaker of the City of Vineland, Santiago merely states that "defendant Brunetta was acting at all times under authority granted to him by N.J.S.A. 40A:14–118...." Pl.'s Br. at 18.

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court held that, for purposes of section 1983, a single decision by a final policymaker could, under appropriate circumstances, establish municipal liability. *See id.*, 475 U.S. at 480, 106 S.Ct. 1292. The United States Court of Appeals for the Third Circuit has instructed that "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990)(citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990)); *accord Woodwind Estates, Ltd. v. W.J. Gretkowski*, 205 F.3d 118, 126 (3d Cir. 2000). "In order to identify who has policymaking responsibility, 'a court must determine which official has final, unreviewable discretion to make a decision or take an action.'" *Bielevicz*, 915 F.2d at 850 (quoting *Andrews*, 895 F.2d at 1481); *accord Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 269 n. 16 (3d Cir. 1995) This determination is based upon state law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Andrews*, 895 F.2d at 1481.

In this case, Santiago merely cites N.J.S.A. 40A:14–118 (West 1993) for the proposition that Brunetta is a final policymaker for the City of Vineland. That provision provides, in relevant part, that the head of the police force, if appointed by the governing body of the municipality and "pursuant to policies established by the appropriate authority" shall:

a. Administer and enforce rules and regulations and special emergency directives for the disposition and discipline of the force and its officers and personnel;

b. Have, exercise, and discharge the functions, powers and duties of the force;

c. Prescribe the duties and assignments of all subordinates and other personnel;

d. Delegate such of his authority as he may deem necessary for the efficient operation of the force to be exercised under his direction and supervision; and

e. Report at least monthly to the appropriate authority in such form as shall be prescribed by such authority on the operation of the force during the preceding month, and make such other reports as may be requested by such authority.

*Id.* The statute clearly does not provide that the Chief of Police for the City of Vineland has unreviewable discretion to hire and fire Vineland Police Department employees. In fact, the statute provides that the head of police acts pursuant to the policies promulgated by the "appropriate authority," which is defined by the statute as "the mayor, manager, or such other appropriate executive or administrative officer, such as a full-time director of public safety...." *Id.* Santiago provides no other argument or authority that Brunetta is a final policymaker.

Accordingly, I find that Santiago has failed to point to any evidence in the summary judgment record which would lead a factfinder to conclude that Brunetta was a final policymaker for the City of Vineland. Because Santiago has failed to raise a genuine issue of material fact as to Brunetta's status, I shall grant the motion of the City of Vineland for summary judgment on Santiago's race discrimination claim pursuant to 42 U.S.C. §§ 1981 and 1983.

(b) The Individual Defendants

Relying on the unpublished decision of *Behrens v. Rutgers Univ.*, No. 94–CV–358, 1996 WL 570989 (D.N.J. March 29, 1996), Defendants Brunetta, Letizia, Fresne and D'Augostine contend that Sections 1981 and 1983 do not support the liability of individual defendants in their personal capacities. Santiago does not raise any argument with respect to the individual defendants. Acknowledging that an unpublished decision has no precedential value before this Court and that the clear weight of authority is to the contrary, I find that the individual defendants may be held liable in their individual capacities under 42 U.S.C. §§ 1981 and 1983.

As a preliminary matter, "[p]ersonal-capacity suits ... seek to impose individual liability upon a government officer for actions taken under color of state law...." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991). It is well-established that an individual defendant can be liable in his or her individual capacity under section 1983 if the individual is personally involved in the alleged wrongs. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* Because individual liability under section 1983 is well-established in this Circuit, the remainder of my analysis shall focus on individual liability under section 1981.[17]

17. In *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id.* at 735, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598; *accord Meachum v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 42 F.Supp.2d 533, 541 n. 7 (E.D.Pa.1999). In the Civil Rights Act of 1991, however, Congress amended section 1981 to include a provision that "[t]he rights protected by [section 1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c)(1994). The Court of Appeals for the Third Circuit has yet to address whether the Civil Rights Act of 1991 created an implied right of action in section 1981. While federal courts have disagreed on the implications of the Act, *see Meachum*, 42 F.Supp.2d

■ In *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit held that individual employees cannot be liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 *et seq. See id.* at 1078. The *Behrens* decision, issued approximately eight months before *Sheridan*, predicted the Title VII analysis of the Third Circuit and held that individual defendants cannot be liable under Title VII. *See id.*, 1996 WL 570989, at *8. Mistakenly, however, the *Behrens* Court assumed without deciding that the section 1981 and 1983 analyses were identical to Title VII and held that an employer's agent may not be held individually liable under §§ 1981 and 1983 as well. *See id.*

The clear weight of authority finds Title VII and section 1981 distinguishable. For example, section 1981 applies to a broad range of contractual relationships while Title VII is limited to discrimination in the workplace only. *See Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F.Supp.2d 27, 33 (D.D.C.1999). More importantly, the statutory language of Title VII clearly imposes liability only upon "employer[s]," as defined by the statute, while section 1981 does not contain such a limitation. *See* 42 U.S.C. § 2000e(b) (1994); *see also Sheppard*, 59 F.Supp.2d at 33; *Dalton v. Jefferson Smurfit Corp.*, 979 F.Supp. 1187, 1202 (S.D.Ohio 1997). Moreover, the Third Circuit has found that "[s]ection 1981 is a federal civil rights remedy ... in the nature of a tort remedy" and therefore individuals who are personally involved in the discrimination against the plaintiff may be held liable. *Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir.1986); *see also Hearne v. Board of Educ. of the City of Chicago*, 185 F.3d 770, 776–777 (7th Cir.1999)(finding individual defendant entitled to dismissal of suit against him in his individual capacity because he had no personal role to play in the case); *Allen v. Denver Public School Bd.*, 928 F.2d 978, 983 (10th Cir.1991)("[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement"); *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir.1986)(finding that individuals may be held liable for section 1981 violations); *Whidbee v. McDonald's Corp.*, 75 F.Supp.2d 183, 192–93 (S.D.N.Y.1999)(stating that individuals must have some "affirmative link to causally connect the actor with some discriminatory action" to incur liability under section 1981); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F.Supp.2d 27, 33 (D.D.C.1999)(same); *Webster v. Fulton County, Georgia*, 44 F.Supp.2d 1359, 1380 (N.D.Ga.1999) (implicitly finding individual defendants subject to section 1981 liability in individual capacities); *Demuren v. Old Dominion Univ.*, 33 F.Supp.2d 469, 475–76 (E.D.Va.1999)(same); *Behnia v. Shapiro*, 961 F.Supp. 1234, 1237 (N.D.Ill.1997)(stating that individual liability under section 1981 attaches only where individual himself participated in the discrimination); *Lewis v. State of Delaware Dep't of Public Instruction*, 948 F.Supp. 352, (D.Del.1996)(implicitly finding section 1981 liability attaches in personal capacity suits); *but see Hunter v. Ark Restaurants Corp.*, 3 F.Supp.2d 9, 15 (D.D.C.1998)(finding that individual defendant under section 1981 is not liable because he is sued in his capacity as agent of the employer, not in individual capacity).

■ In accordance with the clear weight of authority, I find that the individual defendants are subject to liability in their individual, personal capacities under both 42 U.S.C. §§ 1981 and 1983. In this case, the summary judgment record supports the conclusion that the individual defendants Brunetta, Fresne and D'Augostine were all involved, in varying degrees, in Santiago's discharge and bypass. With respect to defendant Letizia, however,

at 541 n. 9 (citing cases), I need not decide this issue at this stage of this litigation since

Santiago has raised his race discrimination claims under both sections 1981 and 1983.

there is nothing in the record to demonstrate his personal involvement in Santiago's bypass. Moreover, Santiago also admits, for all intents and purposes, that Letizia was simply following Brunetta's order, without any other motivation, in discharging him. *See* Defs.' Ex. 53 at 95–97.[18] Accordingly, I shall grant the motion of defendant Letizia only and deny the motions of Brunetta, Fresne and D'Augostine for summary judgment on Santiago's claims of race discrimination, under 42 U.S.C. §§ 1981 and 1983, for race discrimination in his discharge and bypass.

### (c) Defendants Romano & Gallo

■ Next, individual defendants Romano and Gallo, the Mayor and the Director of Public Safety for the City of Vineland, respectively, at all times relevant to the Amended Complaint, move for summary judgment on Santiago's race discrimination claims on the ground that they had no personal involvement in Santiago's case. In support of their motions for summary judgment, Romano and Gallo submit answers to Santiago's interrogatories, in which they state that they had no personal knowledge or involvement with Santiago. *See* Defs.' Exs. 33, 34 at ¶ 15.[19] In opposition to the motions for summary judgment, Santiago alleges that the two men were personally involved with his case because he sent them letters advising them that he was discharged from his post as a special law enforcement officer and that "this termination was unwaranted [sic] and without due cause." Defs.' Ex. 29 (letter from

---

18. The summary judgment record in this case indicates that the following colloquy occurred during one of Santiago's depositions:

Q: (by defense attorney): Lieutenant Letizia was the individual who advised you that you were terminated as a special officer, is that correct?

A: (by Santiago): That's correct.

Q: Do you understand that he was instructed by Chief Brunetta to do so?

A: That's correct.

Q: Now, sir, other than Lieutenant Letizia obeying a direct instruction by his commanding officer, what information do you have that Defendant Letizia in any way acted willfully, purposely, and with a malicious intent to you to deprive you of Constitutional rights?

A: He was my direct supervisor. Knowing my work habits and knowing how I am, working, and, whatever he hears off duty about me personally-just to say that "he's fired" and not have anything to look into it, I have a problem with that ... He's taking an answer, but who knows me better than anyone else in that Department, was Lieutenant Letizia.

Q: Let me reask the question. What information do you have that he acted with a bad intent or malicious intent toward you as opposed to obeying a direct instruction by Chief Brunetta?

A: *I don't believe there is one.*

Q: Do you know of any other motivation or do you claim to have evidence of any other motivation by Lietenant Letizia in terminating you as a special officer, other than obeying the direct instruction by Chief Brunetta?

A: Probably self-gratifying to him. He kind of smirked at me when he told me I was fired.

Defs.' Ex. 53 at 95–97 (emphasis added). Because Santiago admitted that defendant Letizia was following Brunetta's order and that he did not believe, or did not have possession of any information, that Letizia was acting with any other unlawful intent, Letizia is entitled to summary judgment on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983.

19. Interrogatory 15 of defendant Romano and Gallo's answers provide, in relevant part, that:

To the best of my recollection, I was not involved in any way with Luis Santiago. I was not aware of his hiring as a special officer for the City of Vineland. I do not have information, nor was I aware of his performance as a special officer. I was not involved with his termination as a special officer and was not aware of the reasons for same.

I was not aware of Luis Santiago's application for a position as a City of Vineland police officer, nor his application to be a police officer. My job duties did not include day-to-day responsibility regarding individual ability for applicants of positions as police officers or individuals acting as special officers for the City of Vineland Police Department. I simply do not have information one way or the other regarding Mr. Santiago.

Defs.' Exs. 33, 34 at ¶ 15.

Santiago to Romano, dated April 22, 1996) at 1; *see also* Pl.'s Ex. Vol I (Santiago 9/15/1998 Dep.) at 15.

Whether or not the mere receipt of letters would be sufficient to impose liability upon two city officials is not relevant to this race discrimination inquiry because the letters sent by Santiago to Romano and Gallo were insufficient to put the two defendants on notice that Santiago was allegedly discriminated against on the basis of his race. The letter allegedly sent to defendant Gallo is not part of the summary judgment record, but the allegedly similar letter sent to Romano merely states that Santiago's "termination was unwaranted [sic] and without due cause." Defs.' Ex. 29.

In his deposition testimony, Santiago admitted that he had no personal knowledge that defendants Romano and Gallo were personally involved or knew about the actions taken against him, but testified that Romano and Gallo should be held responsible based upon their positions within the City of Vineland. *See* Defs.' Ex. 35 at 10–16. The well-settled case law interpreting liability under sections 1981 and 1983 precludes such a claim. Because Santiago has failed to raise a genuine issue of material fact that defendants Romano and Gallo had personal knowledge or involvement in the alleged discrimination against Santiago on the basis of his race, I shall grant the motions of defendants Romano and Gallo on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983.

### ii. Race Discrimination in violation of the NJLAD

In support of their motions for summary judgment, the individual defendants[20] contend that they did not "aid and abet" the discrimination and therefore they cannot be individually liable under the NJLAD. Santiago does not oppose the motions for summary judgment, and therefore sum-

mary judgment shall be granted if "appropriate." Fed.R.Civ.P. 56(e).

In *Hurley v. Atlantic City Police Department,* 174 F.3d 95 (3d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000), the Court of Appeals for the Third Circuit predicted that the New Jersey Supreme Court would not hold supervisors individually liable as an "employer" under the NJLAD. *See id.* at 125 (interpreting N.J.S.A. 10:5–12(a)). In so holding, the *Hurley* Court analogized the NJLAD to Title VII, stating that:

> While an "employer" may be "one or more individuals" under N.J.S.A. 10:5–5(a), that does not necessarily mean that supervisors, themselves employed by individuals or corporations, are "employers." Title VII defines "employer" to include "a person ... who has fifteen or more employees" or "any agent" of such a person, 42 U.S.C. § 2000e(b), and it could be subjected to the same analysis the dissent uses to find individual liability possible under LAD.
>
> We also note that imposing direct liability on supervisors, who are likely to be substantially judgment-proof, will not significantly add to the force of anti-discrimination law, which already gives employers incentives to ban discrimination and monitor supervisors' activities. We think that there is insufficient reason to predict that New Jersey would diverge from the federal scheme on this point. *See, e.g., Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1077–78 (3d Cir. 1996). In sum, while the point is close, as well as unclear, we are simply not willing to predict that New Jersey would include supervisors in the statutory definition of "employer."

*Id.* at 125.

However, the NJLAD does impose liability on individual supervisors who aid or

---

20. The City of Vineland does not move for summary judgment on Santiago's race dis- crimination NJLAD claim.

abet a principal who violates the law. *See Failla v. City of Passaic,* 146 F.3d 149, 158 (3d Cir.1998). The NJLAD clearly proscribes "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. 10:5–12(e)(West Supp.2000). In *Failla,* the Third Circuit predicted that the New Jersey Supreme Court would follow the Restatement (Second) of Torts and hold an employee liable for aiding and abetting a violation of the NJLAD when he "knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer." *Id.,* 146 F.3d at 158. The Court emphasized that employees cannot be held liable "merely because they had some role, or knowledge or involvement[;]" rather, the degree of culpability must meet the heightened standard set forth by the Restatement. *Id.* at 159; *see also Gardenhire v. New Jersey Mfrs. Ins. Co.,* 333 N.J.Super. 219, 754 A.2d 1244, 1248 (N.J.Super.Law Div.2000)(adopting the Third Circuit's analysis of N.J.S.A. 10:5–12(e)). Subsequently, in *Hurley,* the Third Circuit refined its holding to conclude that only supervisors can be liable as aiders and abettors under the NJLAD:

> [W]e predict that, under New Jersey law, a nonsupervisory employee cannot be held liable as an aider and abettor for his own affirmative acts of harassment, because such affirmative acts do not substantially assist the employer in *its* wrong, which is its failure to prevent and redress harassment by individual employees. Rather, a nonsupervisory employee's harassment takes advantage of the employer's wrongful conduct; it is the employee who seems to be "aided and abetted" by the employer. A supervisor, by contrast, may be liable as an aider and abettor for active harassment or knowing and willful inaction, because in either case the supervisor violates his or her duty as a supervisor to prevent and halt harassment.

*Hurley,* 174 F.3d at 129 (footnotes omitted and emphasis in original). Accordingly, I must first determine which individual defendants were supervisors of Santiago and then, whether genuine issues of material fact exist as to whether those supervisors were aiders and abettors under the NJLAD.

Because the individual defendants misstated the applicable law under the NJLAD, not a single individual defendant contends that he is not a supervisor of Santiago. Construing the facts of this case in the light most favorable to the plaintiff, I shall assume, without deciding, for purposes of these summary judgment motions, that all of the individual defendants named in this action had some type of supervisory role with respect to Santiago. The next question before this Court then, is whether each individual defendant knowingly gave substantial assistance or encouragement to the alleged discrimination involving Santiago.

■ First, for the reasons set forth above with respect to liability under 42 U.S.C. §§ 1981 and 1983, Santiago has not raised a genuine issue of material fact that defendants Romano and Gallo were aiders and abettors of the alleged race discrimination. Romano and Gallo both stated, and Santiago's testimony supported, that they had no personal knowledge or involvement in Santiago's case. Accordingly, I find that Santiago has failed to raise a genuine issue of material fact that defendants Romano and Gallo are individually liable under the NJLAD.

■ Second, as set forth above, there is no evidence in the summary judgment record that defendant Letizia was involved in any way with Santiago's bypass and since Santiago admitted Letizia was acting solely pursuant to Brunetta's order, this Court cannot say that Santiago has raised a genuine issue of material fact that Letizia was encouraging or giving substantial assistance to unlawful conduct. As the Third Circuit held in *Failla v. City of Passaic,* 146 F.3d 149 (3d Cir.1998), an

employee cannot be held liable under the NJLAD "merely because they had some role, or knowledge or involvement." *Id.* at 159. Accordingly, I shall grant the summary judgment motion of defendant Letizia with respect to Santiago's race discrimination claim under the NJLAD.

■ Finally, summary judgment with respect to defendants Brunetta, D'Augostine and Fresne [21] would not be "appropriate" in this case. Those defendants contend that the facts of this case are "barely actionable and certainly do not rise to the level of aiding or abetting" a violation of the NJLAD. Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs.' Brunetta, Letizia, Fresne and D'Augostines [sic] at 22. This Court disagrees and finds that genuine issues of material fact abound with respect to whether the three defendants, who clearly are implicated in Santiago's discharge and bypass, aided and abetted a violation of the NJLAD. Santiago has alleged that the individual defendants knowingly discriminated against him on the basis of his race and has raised genuine issues of material fact as to whether the Defendants' legitimate, nondiscriminatory reasons for his discharge and bypass are pretext for discrimination. Accordingly, because Brunetta, D'Augostine and Fresne have given me no reason to believe that they are not supervisors, I find that on this record, a reasonable factfinder could find that defendants Brunetta, D'Augostine and Fresne knew that violations of the NJLAD were afoot and gave substantial assistance or encouragement to the unlawful discrimination. For that reason, I shall deny the motions of Brunetta, D'Augostine and Frense for summary judgment on Santiago's race discrimination claim under the NJLAD.

### e. Qualified Immunity

■ It is not clear whether the individual defendants have moved for summary judgment on the ground that they are qualifiedly immune from liability on Santiago's employment race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are . . . 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); *see also Michaels v. State of New Jersey*, 222 F.3d 118, 120 (3d Cir.2000); *Morales v. Busbee*, 972 F.Supp. 254, 260 (D.N.J.1997)(Simandle, J.). To ascertain the applicability of the doctrine, a court " 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" *Wilson*, 526 U.S. at 609, 119 S.Ct. at 1697 (quoting *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)); *see also Michaels*, 222 F.3d at 120. In the context of a probable cause determination, the Supreme Court, in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), noted that:

> [T]he right the official is alleged to have violated must have been 'clearly established' in a . . . particularized . . . sense. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

21. In their brief, the individual defendants contend that "[Santiago] does not accuse [Fresne] of any racial animosity" and that "[Santiago] is unaware of any racial animosity on the part of Defendant D'Augostine." Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs.' Brunetta, Letizia, Fresne and D'Augostines [sic] at 21, 22. Unfortunately, the individual defendants cite to a page of Santiago's deposition that they fail to provide as part of the summary judgment record.

violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in light of preexisting law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039; *see also Paff v. Kaltenbach,* 204 F.3d 425, 436 (3d Cir. 2000). Once the law is deemed "clearly established," the pertinent inquiry becomes "whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997)(citing *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct., 534, 536, 116 L.Ed.2d 589 (1991)(per curiam); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987)). Accordingly, "law enforcement officials who 'reasonably but mistakenly' conclude that their conduct comports with the requirements of the [law] are entitled to immunity." *Id.* (quoting *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536). The issue of qualified immunity is a matter of law for the court, unless the historical facts are in dispute. *See Berg v. County of Allegheny,* 219 F.3d 261, 271–72 (3d Cir.2000).

In this case, the briefs in support of the motions for summary judgment make passing reference to, but do not specifically address, qualified immunity with respect to Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD. Such an analysis would require this Court to delve into whether Santiago's rights under sections 1981 and 1983, the existence of which this Court has assumed for purposes of these motions, were clearly established at the time of his discharge and bypass, when this Court has received no input from the parties and can find no relevant evidence in the summary judgment record. Accordingly, I shall deny without prejudice the Defendants' motions for summary judgment on Santiago's employment race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD to the extent that they so move on grounds of qualified immunity. The Defendants shall have the right to refile for summary judgment only on the ground of qualified immunity, and shall submit briefs on the issue within twenty days of the date of this Opinion and accompanying Order. For the sake of clarity, this denial of the motions for summary judgment without prejudice on the ground of qualified immunity does not affect my finding that defendants City of Vineland, Romano, Gallo and Letizia are entitled to summary judgment on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983.

2. *Disability Discrimination under the Americans with Disabilities Act and Handicap Discrimination under the New Jersey Law Against Discrimination ("NJLAD")*

Santiago next alleges that he was discriminated against because the Defendants regarded Santiago as having a disability and handicap, in violation of the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD"). The perceived disabilities and handicaps, he claims, are his involvement in "drug activity," *see* Defs.' Ex. 21 (EEOC charge), and, based upon Dr. Babcock's psychological report, a "mental impairment." Defs.' Ex. 31 (Pl.'s Answers to Interrogatories of City of Vineland) at ¶ 18. In support of their motions for summary judgment, the Defendants contend that Santiago cannot establish a *prima facie* case because he is not disabled or handicapped under the applicable statutes. In the alternative, the Defendants argue that Santiago is unable to demonstrate that the Defendants' legitimate, nondiscriminatory reasons for his discharge and bypass are pretextual. Like many claims in this case, Santiago does not oppose the motions for summary judgment and therefore, summary judgment shall be entered against Santiago only "if appropriate." *See* Fed.R.Civ.P. 56(e).

■ The Americans with Disabilities Act ("ADA") prohibits covered entities [22] from discriminating against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Quite clearly, the ADA was not intended to protect minor impairments or mere medical difficulties; instead, "Congress desired to shield from adverse employment actions those individuals whose medical troubles prevented them from engaging in significant daily activities." *Marinelli v. City of Erie*, 216 F.3d 354, 356, 366 (3d Cir.2000).

■ Similarly, under the NJLAD, it is unlawful discrimination for an employer to refuse to hire or discharge a person on the basis of handicap, "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5–4.1, 5–12(a)(West Supp.2000). The NJLAD defines the term "handicapped," in relevant part, as:

> [S]uffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness ... or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

N.J.S.A. 10:5–5(q) (West Supp.2000); *see also Svarnas v. AT & T Communications*, 326 N.J.Super. 59, 73, 740 A.2d 662 (App. Div.1999). Unlike the ADA, the NJLAD "was intended to cover more than just 'severe' disabilities," *Olson v. General Electric Astrospace*, 966 F.Supp. 312, 315 (D.N.J.1997)(Fisher, J.)(citing *Andersen v. Exxon Co.*, 89 N.J. 483, 446 A.2d 486 (1982)), and, accordingly, does not require that the handicap substantially limit a major life activity. *See id.* at 314. In fact, the New Jersey Supreme Court has held that the statutory definition of "handicapped" is "very broad in its scope." *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 593, 538 A.2d 794 (1988).

■ To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that he: "(1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes (USA)*, 204 F.3d 494, 500 (3d Cir.2000)(quoting *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir.1998) (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996))). In NJLAD claims, the plaintiff must also establish that the employer sought someone else to do the same work. *See Cinelli v. U.S. Energy Partners*, 77 F.Supp.2d 566, 573 n. 5 (D.N.J.1999)(Simandle, J.); *Svarnas v. AT & T Communications*, 326 N.J.Super. 59, 73, 740 A.2d 662 (App.Div.1999). If the plaintiff fails to establish a *prima facie* case of discrimination, then the defendant is entitled to summary judgment. *See Cinelli*, 77 F.Supp.2d at 573 (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989)).

In this case, the Defendants first contend that Santiago has failed to establish a

---

**22.** The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee. *See* 42 U.S.C. § 12111(2).

*prima facie* case under the ADA and the NJLAD because Santiago is not disabled or handicapped. Santiago alleges that he is disabled under the third prong of the ADA because the Defendants regarded him as having a physical or mental impairment that substantially limits a major life activity. Because I shall assume, without deciding, that Santiago was substantially limited in the major life activity of working,[23] the central issue under the ADA and the NJLAD in this case is whether Santiago's sale of drugs and his personality characteristics led the Defendants to perceive Santiago as having a physical or mental "impairment" or "disability." For the reasons set forth below, I find that Santiago has failed to establish that he was perceived as having a physical or mental impairment or disability and, therefore, Santiago has failed to establish a *prima facie* case under the ADA.

As a threshold matter, I note that to establish that he was "regarded as" disabled under the ADA, Santiago need not actually suffer from a *per se* disability for his employer to be held liable under the Act. In *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir.1998)(en banc), the United States Court of Appeals for the Third Circuit held that "even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Id.* at 144 (citing 29 C.F.R. pt. 1630, app. § 1630.2(1)); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 182 (3d Cir.1999); *see also Cinelli v. U.S. Energy Partners*, 77 F.Supp.2d 566, 574–75 (D.N.J.1999)(Simandle, J.)(finding existence of genuine issue of material fact as to whether defendant-employer regarded plaintiff's cancer as substantially limiting his ability to work, even though cancer is not a *"per se"* disability). The Third Circuit has not ameliorated, however, the requirement that the complained-of affliction rise to the level of an "impairment."

The regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") under the ADA define a "physical or mental impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine," or as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R.

---

**23.** At the outset, I note that Santiago failed to state which major life activity was substantially limited by his "drug activity" and his specific personality traits. By alleging that he was fired from his post as a special law enforcement officer and bypassed for hire as a police officer, Santiago implicitly contends that he was substantially limited in the major life activity of working. *See* 29 C.F.R. § 1630.2(i)(1999) (defining major life activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"); *see also Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 144 n. 7 (3d Cir.1998)(en banc); *but see Sutton v. United Airlines*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)(questioning, in dicta, the validity of the inclusion of "working" in the major life activities). To establish that the major life activity of working was substantially limited, a plaintiff must, at a minimum, allege that he is unable to work in a broad range of jobs. *See Sutton*, 119 S.Ct. at 2151. According to the regulations, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)). In this case, this Court recognizes, without deciding, that by terminating Santiago's employment as a special law enforcement officer and by bypassing Santiago for the position of Police Officer, a genuine issue of material fact could exist as to whether the Defendants considered Santiago incapable of performing a broad range of jobs. *See, e.g., Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir.1999)(stating that the defendant seemed to have considered plaintiff incapable for all "jobs requiring significant standing, walking, lifting, or moving about (i.e., most jobs in a supermarket)").

§ 1630.2(h)(1)-(2)(1999). The EEOC further provides, in its "interpretive guidance" to Title I of the ADA, that:

It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural and economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight or muscle tone that are within "normal" range and are not the result of physiological disorder. The definition, likewise does not include characteristic predisposition to illness or disease. Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments. Similarly, *the definition does not include common personality traits such as poor judgment or a quick temper where these are not symptoms of a mental or psychological disorder.*

*Id.* at § 1630(h), App. (emphasis added). In a similar vein, the Supreme Court, in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), held that:

An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.

*Id.,* 119 S.Ct. at 2150.

In factual circumstances similar to those of this case, the United States Court of Appeals for the Second Circuit held that certain "character traits" do not amount to a mental condition constituting an impairment which substantially limited a major life activity, within the meaning of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*[24] *See Daley v. Koch,* 892 F.2d 212, 216 (2d Cir.1989). In *Daley,* a police department rejected a police officer applicant because a psychological test concluded that he showed "poor judgment, irresponsible behavior and poor impulse control," rendering the applicant "unsuitable to be a police officer." *Id.* at 214. Capitalizing on the minor nature of the alleged disability, the Court quoted the following passage from the case of *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986):

It would debase the high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Id.* at 934 (citation omitted). In short, the Court held that the appellant's "personality traits could be described as commonplace; they in no way rise to the level of an impairment." *Id.* at 215.

Years later, the United States District Court for the Southern District of New York applied the holding in *Daley* to find that a correctional officer applicant's personality traits failed to rise to the level of

**24.** The case law involving the definition of a qualified individual under the Rehabilitation Act is applicable to cases involving the ADA. See 29 U.S.C. § 794(d)(1994)(providing that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act ..."); *Donahue v. Consolidated Rail Corp.,* 52 F.Supp.2d 476, 477 n. 1 (E.D.Pa.1999)(citing *Mengine v. Runyon,* 114 F.3d 415, 420 (3d Cir.1997)).

an impairment under the ADA. *See Greenberg v. New York State,* 919 F.Supp. 637, 639, 643 (S.D.N.Y.1996). In *Greenberg,* the plaintiff underwent a required psychological examination as part of the application process for the position of Correction Officer with the Department of Correctional Services. *See id.* at 639. The resulting psychological report stated that the plaintiff "lack[ed] the ability to make decisions regarding security and safety in emergency situations, to perform effecttively (sic) and efficiently under stress, and to identify with potential or actual disruptive situations, required by Correction Officers." *Id.* In holding that the plaintiff failed to state a claim upon which relief can be granted, the District Court found that the plaintiff was not diagnosed with a particular psychological disease or disorder; rather, "the findings of the psychologist are tantamount to a finding that plaintiff has poor judgment in certain situations." *Id.* at 643. Accordingly, the Court found that such personality traits did not rise to the level of impairments under the ADA. *Id.*

■ In this case, a search of the summary judgment record reveals that Santiago attempts to allege two potential impairments: (1) the illegal sale of drugs; and (2) a perceived "mental impairment" based upon the results of his Cumberland County psychological evaluation. *See* Defs.' Ex. 21; Defs.' Ex. 31. Interpreting the facts in the light most favorable to the plaintiff, this Court finds incredible and ridiculous any argument that the sale of illegal drugs is either a physical or mental impairment under the ADA or a disability under the NJLAD. Quite plainly, then, this Court must dismiss Santiago's first allegation.

■ With respect to Santiago's second allegation of impairment, this Court is guided by the EEOC regulations and in-terpretive guidance, as well as the case law of the Second Circuit in finding that Santiago's personality traits and emotional health are not the "impairments" Congress intended to protect through the ADA. The psychological report noted that Santiago: (1) is ambivalent in the handling of his aggression; (2) at times, acts out emotionally, "maybe even violently;" and, (3) possessed a "personality structure which would be detrimental to a law enforcement agency, to the general public and indeed himself." Defs.' Ex. 32 at 1. These personality characteristics are akin to those described in the case law of the Second Circuit and therefore, I find that they are not severe enough to rise to the level of an impairment under the ADA.

Finally, I find that despite the expansive scope of the term "handicapped" under the NJLAD, Santiago's personality traits are not cognizable under the NJLAD. Accordingly, I find that summary judgment on Santiago's discrimination claims under the ADA and the NJLAD is "appropriate" and I shall grant summary judgment on those claims.

### 3. *Retaliation*

In Count Six of the Amended Complaint, Santiago alleges that "[t]he continued refusal of the [D]efendants to employ the Plaintiff [as a Vineland Police Officer] and the ... [August 21, 1996] arrest of the Plaintiff were performed by the Defendants in order to retaliate against the Plaintiff for filing claims [with the EEOC] under Title 7 of the Civil Rights Act, the Americans [w]ith Disabilities Act and the New Jersey Law Against Discrimination" and accordingly, violated the three statutory provisions. *See* Am. Compl. at ¶¶ 65–66.[25] The issue before this Court with respect to Count Six of the Amended Com-

---

25. Despite Santiago's allegations that the Defendants retaliated against him "for filing claims under Title 7[sic] of the Civil Rights Act, the Americans with Disabilities Act and the New Jersey Law Against Discrimination," there is no evidence in the summary judgment record before me that Santiago filed any charges with any agency, federal or state, other than his ADA disability discrimination charge, which was submitted to the EEOC on April 8, 1996. Accordingly, I shall analyze Santiago's retaliation claim as stating that he was retaliated against for the filing of the April 8, 1996 charge.

plaint is whether individual defendants can be liable under the ADA and to decipher from this cloudy record whether or not the City of Vineland and individual defendants Romano and Gallo actually moved for summary judgment on Count Six of the Amended Complaint.

### a. Individual Defendants Brunetta, Frense, Letizia and D'Augostine

■ In support of their motion for summary judgment, individual defendants Brunetta, Fresne, Letizia and D'Augostine contend that like Title VII, the ADA does not support individual liability. Because Santiago does not provide any opposition to this argument, summary judgment shall be granted if "appropriate." *See* Fed. R.Civ.P. 56(e).

The ADA and Title VII prohibit a covered entity [26] or employer from discriminating against an individual based upon a disability, *see* 42 U.S.C. § 12112, or because of the individual's race, color, religion, sex, or national origin, *see* 42 U.S.C. § 2000e–2(a)(1). It is well settled that, "in the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose-to prohibit discrimination in employment against members of certain classes." *Walton v. Mental Health Ass'n of Southeastern Pennsylvania,* 168 F.3d 661, 666 (3d Cir.1999); *see also Kohn v. AT & T Corp.,* 58 F.Supp.2d 393, 419 (D.N.J.1999)(Lechner, J.). Accordingly, the Third Circuit applies the case law under all three statutes interchangeably.

*See Walton,* 168 F.3d at 666; *Kohn,* 58 F.Supp.2d at 419.

In this case, Santiago brings his claim under the anti-retaliation provision of the ADA which provides, in relevant part, that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a)(1994).

Subsection (c) of this provision provides that the remedies available for a violation of the anti-retaliation provision are set forth in 42 U.S.C. § 12117. *See* 42 U.S.C. § 12203(c)(1994).[27] Section 12117, in turn, explicitly incorporates the remedies available under Title VII. *See* 42 U.S.C. § 12117(a);[28] *see also Baird v. Rose,* 192 F.3d 462, 471–72 (4th Cir.1999); *Kautio v. Zurich Ins. Co.,* No. 97–2411–JWL, 1998 WL 164623, at * 2 (D.Kan. March 19, 1998).

Under Title VII, actions may be brought only against an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 2000e–5(b). The statutory definitions of "employer" under Title VII and the ADA are virtually identical. *See* 42 U.S.C. § 2000e ("a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such

---

**26.** The ADA defines "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

**27.** Section 12203(c) provides, in relevant part:

> The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

42 U.S.C. § 12203(c)(1994).

**28.** 42 U.S.C. § 12117 (1994) provides, in pertinent part:

> The powers, remedies and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

a person"); 42 U.S.C. § 12111(5)(A)("a person engaged in an industry affecting commerce who has fifteen or more employees ... [or] any agent of such a person"); *see also Kohn,* 58 F.Supp.2d at 419 (collecting statutory definitions and cases). Neither Title VII nor the ADA explicitly provide for liability against any individuals.

Like many other Courts of Appeal, the Third Circuit has held that individual employees do not meet the definition of "employer" under Title VII and therefore cannot be liable. *Sheridan v. E.I. DuPont de Nemours,* 100 F.3d 1061, 1077–78 (3d Cir. 1996)(en banc); *Dici v. Commonwealth of Pennsylvania,* 91 F.3d 542, 552 (3d Cir. 1996). The decisions of the District Courts in this Circuit have extended the *Sheridan* holding to conclude that there is no individual liability under the ADA. *See Douris v. Brobst,* No. CIV. A. 99–3357, 2000 WL 199358, at *2 (E.D.Pa. Feb. 18, 2000)(collecting cases); *Kohn,* 58 F.Supp.2d at 420 (collecting cases).

In light of the Third Circuit's decision in *Sheridan* that Title VII does not support individual liability and that the ADA specifically incorporates the remedies available under Title VII, as well as the great weight of authority of the District Courts in this Circuit, I hold that the ADA anti-retaliation provision does not provide a remedy against individual defendants. *See also Baird,* 192 F.3d at 472; *Kautio,* 1998 WL 164623 at *2; *Stern v. California State Archives,* 982 F.Supp. 690, 692–94 (E.D.Cal.1997). Accordingly, I shall grant the motion of defendants Brunetta, Letizia,

Fresne and D'Augostine for summary judgment on Count Six of the Amended Complaint because they are entitled to judgment as a matter of law.

b. The City of Vineland and Individual Defendants Romano and Gallo

In their moving brief, defendants City of Vineland, Romano and Gallo only contend that "[Santiago] has no claim for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. [§ ] 12111 or the L.A.D., cannot demonstrate that [Santiago] was disabled or perceived as disabled and cannot demonstrate that the reason for actions as to [Santiago] were a mere pretext for disability discrimination." Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defendants City of Vineland, Joseph Romano and John Gallo at 25. At no point in their moving papers do these defendants mention the applicable statutory provision, 42 U.S.C. § 12203(a) (1994),[29] or discuss the distinct *prima facie* elements necessary to establish a retaliation claim under the ADA and the NJLAD.[30] Instead, and presumably in the hope that it would suffice, the Defendants stated that:

> This motion is directed at all counts of the Amended Complaint as developed in discovery. To the extent a count is not directly addressed, it is understood to be without basis. To the extent plaintiff provides argument on any such point in opposition, reply will be provided.

Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs. City of Vineland,

*Id.* at § 12117(a).

**29.** Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a); *see also Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997). "An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim." *Krouse,* 126 F.3d at 502.

**30.** To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show:

" '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.' " *Shaner v. Synthes (USA),* 204 F.3d 494, 500 (3d Cir.2000)(quoting *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997)). The factors in a *prima facie* case under the NJLAD are the same. *See Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 71 (3d Cir.1996)(citing *Romano v. Brown & Williamson Tobacco Corp.,* 284 N.J.Super. 543, 665 A.2d 1139 (App.Div.1995)).

Joseph Romano and John Gallo at 2. The inclusion of such language in a brief filed in support of a motions for summary judgment demonstrates a shocking lack of understanding of the summary judgment procedures embodied in Rule 56. It is the *moving party's burden to demonstrate that it is entitled to summary judgment.* This is an affirmative obligation of the moving party. Summary judgment cannot be granted based upon an "implication."

Despite these defendants' feeble and unfocused attempt to move for summary judgment on his retaliation claim, Santiago, in opposition to the motions for summary judgment, has responded that a genuine issue of material fact exists as to whether he was retaliated against for the filing of his disability discrimination charge with the EEOC. *See* Pl.'s Br. at 35–36. Specifically, he argues that he need not be "disabled" under the ADA to have standing to bring a retaliation claim. *See id.* at 36. Not surprisingly, the Defendants then addressed the retaliation claim in their reply briefs, raising new contentions in support of their motions for summary judgment. *See* Reply Br. on behalf of Defs. City of Vineland, Joseph Romano and John Gallo at 3–5. At no time did Santiago request permission from this Court to respond to these defendants' new arguments, or ask this Court to establish a schedule for additional briefing on the issue.

Federal Rule of Civil Procedure 56(c) requires the nonmoving party to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials. *See Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1164 (10th Cir.1998)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (holding that summary judgment is to be entered only if nonmovant is on notice that it must come forward with all of its evidence)). If a moving party raises in a reply brief new justifications in support of its motion for summary judgment, and the Court considers those arguments, the nonmoving party must be granted an opportunity to respond. *See id.* Because I find that defendants City of Vineland, Romano and Gallo failed to raise properly the retaliation issue in their moving papers and that their statement that all counts of Santiago's Amended Complaint are "understood to be without basis" fails to provide the required notice to Santiago, I must conclude that the Defendants did not properly move for summary judgment on Count Six of the Amended Complaint. To interpret such an all–encompassing statement as properly moving for summary judgment would require this Court to relinquish its role as a neutral arbiter and adopt the role of an advocate. Instead, the crafting of these defendants' arguments is a task which their attorneys ostensibly were retained to perform and, unfortunately, they have failed to do so. As noted above, the failure of counsel to follow the procedures set forth in Rule 56 disserves the interests of their clients and wastes the time of this Court. Therefore, this Court will disregard the belatedly-raised arguments set forth in the reply brief since this Court has not and will not permit additional briefing on the issue by the parties. *See UTI Corp. v. Fireman's Fund Ins. Co.,* 896 F.Supp. 362, 370 n. 6 (D.N.J.1995)(Simandle, J.).

Fortunately for defendants Romano and Gallo, I have decided, as a matter of law, that the ADA's anti-retaliation provision does not provide a remedy against individual defendants. In light of my holding, to retain these two individual defendants in this action under Count Six of the Amended Complaint when there clearly is no basis for their liability would be unjust. Accordingly, for the reasons set forth above in relation to individual liability under the ADA, I shall dismiss Count Six of the Amended Complaint as against individual defendants Romano and Gallo.

In sum, Count Six of the Amended Complaint is dismissed against all defendants except for the City of Vineland.

### C. 42 U.S.C. §§ 1981A, 1982, 1983, 1985, 1986 and 1988

#### 1. *Violation of Due Process of Law*

##### a. The Alleged Failure to Provide a Pre–Deprivation Hearing

In Count Three of the Amended Complaint, Santiago alleges that his discharge from his position as a special law enforcement officer, which allegedly was without cause and conducted without an adequate hearing, was violative of his due process rights under the United States Constitution. *See* Am. Compl. at ¶ 51. The Defendants contend, in support of their motions for summary judgment, that Santiago received the very limited process that he was due. In the alternative, the Defendants contend that Santiago is barred from bringing a due process claim before this Court because he failed to exhaust his administrative remedies within forty-five days of his discharge. In opposition to the motions for summary judgment, Santiago argues that genuine issues of material fact exist as to the amount of process he received; Santiago contends that he was not provided notice or a meaningful opportunity to respond to the allegedly fallacious accusation of narcotic involvement. For the reasons set forth below, I find that summary judgment is not warranted on Santiago's due process claim because Santiago was entitled to a pre-deprivation hearing, and genuine issues of material fact exist as to whether, in fact, Santiago received the appropriate level of due process.

At the outset, this Court finds that the Defendants' argument concerning Santiago's failure to exhaust his administrative remedies with respect to his due process claim is entirely without merit. Citing N.J.S.A. 40A:14–147, the Defendants contend that Santiago has no cause of action for his discharge because he failed to request a hearing within forty-five days of his termination. According to the Defendants, this "highlights the technical and untimely nature of [Santiago's] claim and constitutes a waiver of any claim right for any additional hearing." Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs. City of Vineland, Joseph Romano and John Gallo at 34.

In the first instance, there is nothing before this Court to suggest that Santiago seeks an additional hearing; instead, Santiago alleges that the Defendants' failure to afford him a hearing at the time of his termination was violative of his due process rights. Second, N.J.S.A. 40A:14–147, contrary to the assertions of the Defendants, does not provide that a police officer has forty-five days in which to file an appeal of a disciplinary actions with the New Jersey Superior Court. *But see* N.J. Ct. R. 4:69–6 (2000). Rather, the provision, which is applicable only to police officers and therefore inapplicable to Santiago, states that a complaint must be filed against an offending police officer within forty-five days of the time the complainant obtained sufficient information to file. *See* N.J.S.A. 40A:14–147. Finally, nothing in New Jersey Court Rule 4:69–6 (2000), which is vaguely referenced by the Defendants as standing for the proposition that Santiago could have filed an appeal of the termination decision with the New Jersey Superior Court, bars this Court from deciding Santiago's due process claim under the Fourteenth Amendment to the United States Constitution.

■ Moving then to the due process issue in this case, to establish a claim under 42 U.S.C. § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person "acting under color of State law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *see also Abbott v. Latshaw,* 164 F.3d 141, 145 (3d Cir.1998). Because the parties seem to concede the obvious point that the Defendants in this case were acting under color of State law, this Court must determine whether there exists a genuine issue of material fact that

Santiago's Fourteenth Amendment due process rights were violated.

■ The Fourteenth Amendment to the United States Constitution prohibits state actors from depriving any person of life, liberty or property without due process of law. U.S. Const. amend. XIV. In this case, Santiago alleges that he was deprived of a property interest without sufficient process when the Vineland Police Department terminated his employment as a special law enforcement officer without cause and without an adequate hearing. *See* Am. Compl. at ¶ 51. To invoke the safeguards associated with procedural due process, Santiago must first establish that he was deprived of a protected interest under the Due Process Clause. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709–2710, 33 L.Ed.2d 548 (1972); *see also Latessa v. New Jersey Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir.1997). If such an interest is established, this Court must then determine whether Santiago received the appropriate amount of process. *See McDaniels v. Flick*, 59 F.3d 446, 454 (3d Cir.1995).

■ The existence of a property interest is largely dependent upon state law. *See Carter v. City of Philadelphia*, 989 F.2d 117, 120 (3d Cir.1993). "Property interests ... are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law ... that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *accord Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Greene v. Barrett*, 174 F.3d 1136, 1140 (10th Cir.1999); *Stana v. School Dist. of the City of Pittsburgh*, 775 F.2d 122, 125 (3d Cir.1985). To rise to the level of a cognizable property interest, the state statute must give the recipient "a legiti-

mate claim of entitlement to [the benefit]." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701; *accord Greene*, 174 F.3d at 1140; *Latessa v. New Jersey Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir.1997); *Stana*, 775 F.2d at 126.

■ In this case, Santiago contends that he had a protected property interest in his employment as a special law enforcement officer under N.J.S.A. 40A:14–146.14 (West 1993), which provides that:

> Special law enforcement officers may be appointed for terms not to exceed one year, and the appointments *may be revoked by the local unit for cause after adequate hearing*, unless the appointment is for four months or less, in which event the appointment may be revoked without cause or hearing.

*Id.* at 40A:14–146.14(a)(emphasis added). Because he was appointed consistently to one-year terms, Santiago could only be discharged "for cause after adequate hearing." Clearly, New Jersey law created a property interest in Santiago's position as a special law enforcement officer.

Next, this Court must determine the amount or level of process to which Santiago was entitled prior to his discharge. While the Defendants vociferously argue, and Santiago disputes, that he received sufficient post-termination process, this argument presupposes that a pre-termination hearing was not required. In fact, there is no evidence in the record disputing defendant Brunetta's deposition testimony that neither he nor any officer at his direction asked Santiago to respond to the allegations against him. *See* Defs.' Ex. 41 at 78. Accordingly, there is no evidence in this summary judgment record before me that Santiago was ever provided the opportunity to respond before Brunetta ordered his termination. Accordingly, this Court must determine then whether a pre-deprivation hearing was in fact required.

■ "The fundamental requirement of due process is the opportunity to be

heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976)(quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). It is axiomatic that due process is "'flexible and calls for such procedural protections as the particular situation demands.'" *Id.,* 424 U.S. at 334, 96 S.Ct. at 902 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)); *accord Gilbert v. Homar,* 520 U.S. 924, 930, 117 S.Ct. 1807, 1812, 138 L.Ed.2d 120 (1997). Accordingly, this Court must consider the tripartite balancing test as set forth in *Goldberg v. Kelly,* 397 U.S. 254, 263–71, 90 S.Ct. 1011, 1018–22, 25 L.Ed.2d 287 (1970) and affirmed in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the factors of which are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.,* 424 U.S. at 334, 96 S.Ct. at 903.

In this case, Santiago's private interest in maintaining his employment as a special law enforcement officer was significant, considering the fact that his termination was final. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985)(recognizing "the severity of depriving a person of the means of livelihood"). Second, the allegations against Santiago were obtained from a confidential informant, whose reliability is not briefed by the parties and is only referenced once in the record, and involved conduct that occurred one and one-half to two years prior to the date it was reported. Given the staleness of the information and the inher-

ently suspect nature of the informant, the risk of erroneous deprivation in Santiago's case is crucial. Finally, this Court acknowledges that the governmental interest in maintaining a body of law-abiding special law enforcement officers is high.

In *Gilbert v. Homar,* 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), the Supreme Court held that a university police officer, who had been arrested on drug-related charges, was not entitled to a hearing before his suspension without pay. *See id.,* 520 U.S. at 928–936, 117 S.Ct. at 1811–1815. In so holding, Justice Scalia quoted the Court's decision in *FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988), for the proposition that "'[a]n important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.'" *Gilbert,* 520 U.S. at 930–31, 117 S.Ct. at 1812 (quoting *Mallen,* 486 U.S. at 240, 108 S.Ct. at 1787–1788). Specifically, Justice Scalia found that the significant government interest in preserving public confidence in the police force and the low risk of erroneous deprivation based upon the arrest and the filing of criminal charges overwhelmed the respondent's private interest in the prevention of a temporary disruption in the receipt of his paycheck. *See id.,* 520 U.S. at 931–35, 117 S.Ct. at 1812–1814.

This case is distinguishable from *Gilbert* on many levels. First, as set forth above, the private interest in retaining employment is much higher in this case because Santiago's employment as a special police officer was terminated, not merely suspended. Next, while this Court acknowledges that the government interest in preserving the public confidence in all of its employees is significant, the risk of erroneous deprivation was profound. The evidence against Santiago, which was obtained from one confidential informant, merely implicated him in a crime, which

allegedly occurred almost two years earlier. Indeed, the Defendants concede that they did not possess any information that Santiago was currently involved in the commission of a crime. *See* Defs.' Ex. 5 at 1.

This Court acknowledges that the termination involved arguable, subjective, issues, but "the right to a hearing does not depend on a demonstration of certain success." *Loudermill,* 470 U.S. at 544, 105 S.Ct. at 1494 (citing *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978)). In this case, I find that the significant private interest and high risk of erroneous deprivation outweigh the governmental interest in immediate termination and therefore Santiago was entitled to a pre-deprivation hearing which, at a minimum, would have provided Santiago notice and an opportunity to respond. *See id.,* 470 U.S. at 545–546, 105 S.Ct. at 1495.[31]

The Defendants contend that Santiago received adequate notice and that Santiago had an opportunity to respond in the post-deprivation hearing with Captain Martinez. *See* Def.'s Br. at 31 ("In plaintiff's self-described hearing without an attorney ... he responded to the charges by denying the charges and was advised of his right to an attorney and to take what action that he deemed necessary"). Santiago, on the other hand, argues that he received insufficient notice from the Defendants because they failed to provide specific information concerning the drug allegations against him and that he never had an opportunity to respond.

Summary judgment is not warranted in this case because Santiago has raised genuine issues of material fact concerning the process he received. First, it is unclear whether the Defendants ever provided Santiago with a specific explanation of the charges against him or whether Santiago knew of the allegations surrounding his involvement in Freddy Oquendo's drug operation through his brother, Angel Santiago. *See generally, Fraternal Order of Police, Lodge No. 5 v. Tucker,* 868 F.2d 74, 80 (3d Cir.1989)(finding that defendant who failed to provide specific information about drug use allegations to plaintiff police officers deprived plaintiff police officers of due process because, without the information, there was no real opportunity to rebut the evidence). Second, the evidence contained in the summary judgment record raises genuine issues of material fact as to whether Santiago was provided a meaningful opportunity to respond to the allegations against him before he was discharged, or whether, instead, he was summarily terminated at Chief Brunetta's direction. Because genuine issues of material fact exist surrounding the amount of pre-termination process Santiago received, I must deny the motions of the Defendants for summary judgment.

b. Municipal and Individual Liability

The Defendants next set forth two central arguments in support of their motion for summary judgment with respect to Santiago's section 1983 due process claim: (1) the City of Vineland did not act pursuant to a policy or custom and therefore cannot be liable under 42 U.S.C. § 1983; and (2) the individual defendants were not personally involved in Santiago's termination and therefore they cannot be liable under section 1983.

In opposition to the motion of the City of Vineland, Santiago sets forth the same arguments as he asserted with respect to the City's motion under 42 U.S.C. §§ 1981 and 1983, namely that: (1) the City of Vineland maintains a practice that "makes it more difficult for Hispanic officers to obtain employment and maintain such employment after obtained;" and (2) the City is liable pursuant to the acts of Brunetta, who is a final policymaker of the City. *See* Pl.'s Br. at 42. Because of the identical nature of Santiago's arguments, I need not

**31.** Because I find that Santiago was entitled to an appropriate pre-deprivation hearing, I need not decide whether the post-termination process afforded to Santiago was sufficient.

reiterate my earlier analysis. For the reasons set forth above, I shall grant the motion of the City of Vineland for summary judgment on Santiago's procedural due process claim pursuant to 42 U.S.C. § 1983.

Further analysis is required, however, with respect to the involvement of the individual defendants. At one end of the spectrum, defendants Brunetta and Letizia were clearly personally involved in the process of Santiago's termination. According to the facts interpreted in the light most favorable to the plaintiff, Brunetta decided to discharge Santiago and ordered Letizia to carry out the termination. Accordingly, I shall deny the motions of Brunetta and Letizia on the ground that genuine issues of material fact exist as to their personal involvement in Santiago's discharge.

At the other end of the spectrum, there is nothing in this summary judgment record that would lead a reasonable factfinder to conclude that defendants Fresne or D'Augostine were in any way personally involved in the pre-termination process of Santiago's discharge. This Court recognizes that, interpreting the facts in the light most favorable to Santiago, a genuine issue of fact exists as to whether Fresne was present during Santiago's post-termination hearing with Captain Martinez. However, this issue of fact is irrelevant to the question of whether Fresne was personally involved with Santiago's pre-termination process. Accordingly, Santiago has failed to raise a genuine issue of material fact with respect to the personal involvement of defendants Fresne and D'Augostine in the process of his termination. Therefore, I shall grant their motions for summary judgment on Santiago's procedural due process claim under 42 U.S.C. § 1983.

In the middle of these two extremes lie defendants Romano and Gallo, who stated in their answers to Santiago's interrogatories that they were not involved in Santiago's termination and therefore are entitled to summary judgment on Santiago's due process claim. *See* Defs.' Exs. 33, 34 at ¶ 15. In opposition to the motions, Santiago contends that both defendants had personal knowledge that Santiago's termination was "without cause" because of letters sent by Santiago to Romano and Gallo. *See* Defs.' Ex. 29 at 1; *see also* Pl.'s Ex. Vol. I (Santiago 9/15/1998 Dep.) at 15. In fact, the summary judgment record supports that the letter to defendant Gallo was sent via certified mail. *See* Defs.' Ex. 29 at 1.

In *Rode v. Dellarciprete,* 845 F.2d 1195 (3d Cir.1988), a plaintiff argued that the defendant Governor of the State of Pennsylvania was personally involved in, among other things, alleged violations of 42 U.S.C. § 1983, because she had filed grievances with his office of administration. *See id.* at 1208. In finding that the plaintiff had failed to state a claim against the Governor, the United States Court of Appeals for the Third Circuit stated that:

> These allegations are simply insufficient to show that Governor Thornburgh had actual knowledge of Rode's alleged harassment. In a large state employing many thousands of employees, a contrary holding would subject the Governor to potential liability in any case in which an aggrieved employee merely transmitted a complaint to the Governor's office of administration or to the Lieutenant Governor's office.

*Id.*

In this case, unlike the plaintiff's allegations against the defendant Governor in *Rode,* Santiago has raised a genuine issue of material fact as to whether defendants Romano and Gallo had actual knowledge of and acquiesced in the wrongful conduct of those they supervised. *See, e.g., Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1293 ("finding personal involvement can be shown if defendants personally 'participated in violating [plaintiff's] rights, .... that [they] directed others to violate them, or that [they] ... had knowledge of and ac-

quiesced in [their] subordinates' violations' ")(quoting *Baker v. Monroe Township*, 50 F.3d 1186, 1190–91 (3d Cir.1995)). Whether or not Romano and Gallo personally received and reviewed the letters from Santiago is a genuine issue of material fact precluding summary judgment in this case. Accordingly, I shall deny the motions for summary judgment of defendants Romano and Gallo with respect to Santiago's procedural due process claim, pursuant to 42 U.S.C. § 1983.

In sum, because Santiago has failed to establish a genuine issue of material fact that the City of Vineland acted pursuant to a policy or custom or that Fresne and D'Augostine were personally involved in the process of his termination, I shall grant their motions for summary judgment on Santiago's due process claim, pursuant to 42 U.S.C. § 1983 and deny the motions of Romano, Gallo, Brunetta and Letizia.

### c. Qualified Immunity

 Defendants Brunetta and Letizia [32] next contend that even if they violated Santiago's rights to due process, they are qualifiedly immune from liability. An analysis of the doctrine of qualified immunity was set forth above and shall not be repeated here.

In this case, Santiago has established the existence of a genuine issue of material fact regarding whether the actions of the Defendants violated his rights under the Fourteenth Amendment. It is not disputed that at the time of Santiago's termination, the law of procedural due process involving state employees who could not be terminated without cause and an adequate hearing was clearly established. The inquiry shifts then to whether, in light of the clearly established law and the information then available, whether a reasonable offi-

cer would have believed that the conduct of the Defendants deprived Santiago of his right to procedural due process. *See Abbott v. Latshaw*, 164 F.3d at 148.

If at trial it is found that the Defendants failed to provide a sufficient pre-termination hearing, as a matter of law, the Defendants are not qualifiedly immune. In his deposition, Defendant Brunetta testified that Santiago was not afforded a "formal hearing" because he believed that Santiago was an "at will" employee. Ignorance of a clearly worded statute and of the well-established law does not demonstrate the reasonableness of an officer's actions. Accordingly, I find that a reasonable officer in the position of the Defendants could not have believed that his or her conduct in depriving Santiago of pretermination process was lawful. Therefore, I find that if it is established at trial that the Defendants did not provide an adequate pre-termination hearing, they are not qualifiedly immune from liability on Santiago's due process claim.

In sum, I find that Santiago's due process claim under 42 U.S.C. § 1983 is still viable against individual defendants Romano, Gallo, Brunetta and Letizia, but shall be dismissed as against the City of Vineland, Fresne, and D'Augostine.

### 2. *Conspiracy, pursuant to 42 U.S.C. § 1985(1)*

 In Count Three of the Amended Complaint, Santiago alleges that "the aforesaid acts were committed pursuant to a conspiracy to prevent [Santiago] from holding an office of public trust and to deprive [Santiago] of his rights and privileges in violation of 42 U.S.C. § 1985." Am. Compl. at ¶ 52. Defendants Brunetta, Letizia, Fresne and D'Augostine move for summary judgment on the ground that

---

**32.** Because the qualified immunity analysis set forth in the brief of Romano and Gallo clearly contends that qualified immunity is available to the police officer defendants, and does not mention Romano and Gallo in their positions as Mayor and Director of Public Safety, respectively, I find that individual de-

fendants Romano and Gallo do not move for summary judgment on grounds of qualified immunity. *See* Br. in Supp. of Notice of Motion for Summ. J. on behalf of Defs.' City of Vineland, Joseph Romano and John Gallo at 36–37.

Santiago failed to establish a *prima facie* case of conspiracy under 42 U.S.C. § 1985. Since Santiago does not oppose the motion, summary judgment shall be entered if "appropriate." *See* Fed.R.Civ.P. 56(e).

42 U.S.C. § 1985 provides, in relevant part, that an injured party may have an action for the recovery of damages "[i]f two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof. . . ." 42 U.S.C. § 1985(1)(1994). Quite clearly, this provision applies to federal officers and does not extend to municipal police officers. *See, e.g., Benningfield v. City of Houston,* 157 F.3d 369, 378 (5th Cir.1998)(stating that section 1985(1) applies to federal, not state, officials); *Salmon v. Miller,* 951 F.Supp. 103, 106 (E.D.Tex.1996)(finding § 1985(1) inapplicable to municipal judges). Accordingly, I find that summary judgment on Santiago's 42 U.S.C. § 1985 claim is "appropriate." Because Santiago does not proffer any support for the proposition that he is protected by 42 U.S.C. § 1985(1), I shall grant summary judgment with respect to all defendants, including the City of Vineland, Romano and Gallo, because it is clear that despite their failure to so move, they cannot, as a matter of law, be liable to Santiago under the federal statute.

### 3. *Remaining Claims*

In Count Three of the Amended Complaint, Santiago throws in the proverbial "kitchen sink" and alleges, pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986 violations of his First, Fourth, Fifth, Sixth and Fourteenth Amendment rights and seeks damages pursuant to 42 U.S.C.

§§ 1981A and 1988. *See* Am. Compl. at ¶ 51. Aside from the issues discussed above, neither party has provided any argument on any remaining issue under Count Three. This Court can only assume then that the Defendants rely on the boilerplate language set forth in their summary judgment briefs that their "motion is directed at all counts of the Amended Complaint as developed in discovery. To the extent a count is not directly addressed, it is understood to be without basis." Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defs. City of Vineland, Joseph Romano and John Gallo at 2; *see also* Br. in Supp. of Notice of Mot. for Summ. J. on behalf of Defendants Brunetta, Letizia, Fresne and D'Augostines [sic] at 3. Simply stated, it is not the duty of this Court to sift through the Amended Complaint and the summary judgment record in this case to determine whether Santiago has any viable claim under the laundry list of constitutional provisions his counsel has alleged. Neither is it Santiago's duty to respond to an inappropriately briefed summary judgment motion. Accordingly, for the reasons set forth in Part III(B)(3)(b) of this opinion, I find that the Defendants have failed to move for summary judgment appropriately with respect to the totality of Count Three of the Amended Complaint and, therefore, summary judgment shall not be granted on any claims not explicitly set forth in this Opinion.

### D. False Arrest

In Counts Three and Five of the Amended Complaint, Santiago alleges, among other things, claims of false arrest under 42 U.S.C. § 1983 [33] and New Jersey law.[34] *See* Am. Compl. at ¶¶ 51, 62–64. In

---

**33.** Section 1983 provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

> privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (West Supp.2000).

**34.** Santiago alleges, and the Defendants do not dispute, that he filed with the Defendants

support of their motions for summary judgment, the Defendants contend that probable cause existed for Santiago's August 21, 1996 arrest, and, in the alternative, that they are qualifiedly immune on Santiago's federal false arrest claim. Santiago does not explicitly oppose the motions for summary judgment on the section 1983 claim, but argues, in opposition to the motions as applied to the state law causes of action, that genuine issues of material fact exist regarding the Defendants's true motive in effectuating Santiago's arrest. *See* Pl.'s Br. at 41. Santiago admits, however, that, once in custody, he gave information to the arresting officers that would constitute probable cause. *See id.*[35] I shall first set forth the elements of false arrest and then address the issues of probable cause and qualified immunity.

To state a section 1983 claim for false arrest, a plaintiff must establish that he was arrested by a state actor without probable cause. *See Palma v. Atlantic County,* 53 F.Supp.2d 743, 755 (D.N.J.1999)(Orlofsky, J.)(citing *Sharrar v. Felsing,* 128 F.3d 810, 817–18 (3d Cir. 1997)). Under New Jersey law, the plaintiff need not prove the lack of probable cause, but its existence, as a defense, will defeat a claim for false arrest.[36] *See Mesgleski v. Oraboni,* 330 N.J.Super. 10, 24–25, 748 A.2d 1130 (App.Div.2000). In this case, while it is clear that the parties carry different ultimate burdens with respect to the federal and state false arrest claims, the burdens do not affect this Court's inquiry into whether genuine issues of material fact exist regarding probable cause.

Recently, in *Paff v. Kaltenbach,* 204 F.3d 425, 436 (3d Cir.2000), the United States Court of Appeals for the Third Circuit set forth the standard governing the existence of probable cause in the federal context:

> Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested. *See United States v. Cruz,* 910 F.2d 1072, 1076 (3d Cir.1990). It "is a fluid concept—turning on the assessment of probabilities in particular factual context—not readily, or even usually, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made "on the spot" under pressure and do "not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands." *Gerstein v. Pugh,* 420 U.S. 103, 121, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). A "'common sense' approach [must be taken] to the issue of probable cause" and a determination as to its existence must be based on "the totality of the circumstances." *Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir.1997).

*Id.* at 436. Because the standard governing probable case is generally the same under New Jersey law as it is in the

---

a Notice of Tort Claim pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1–1, *et seq. See* Am. Compl. at ¶ 14.

**35.** At the outset I note that, contrary to Santiago's quasi–admission, the question before this Court is not whether the Defendants had probable cause to arrest Santiago after he was in custody; rather, this Court must determine whether, at the moment the Defendants seized Santiago, they had probable cause to effectuate the arrest.

**36.** Under New Jersey law, "[f]alse arrest ... is 'the constraint of the person without legal justification.'" *Ramirez v. United States,* 998 F.Supp. 425, 434 (D.N.J.1998)(quoting *Fleming v. United Parcel Serv., Inc.,* 255 N.J.Super. 108, 155, 604 A.2d 657 (Law Div.1992)). The tort of false arrest consists of: (1) an arrest or detention of the person against his will; (2) which is done without proper legal authority or legal justification. *See id.*

federal context, I shall set forth its most recent exposition in the margin.[37]

The Supreme Court has found that, under certain circumstances, an informant's tip can provide probable cause to arrest. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court abandoned the traditional two-pronged *Aguilar—Spinelli* test, which required courts to analyze the informant's "basis of knowledge" and "veracity," and adopted a "totality of the circumstances" test to determine whether an informant's tip establishes the requisite probable cause for an arrest warrant. The Court wrote:

> [T]he "two-pronged test" directs analysis into two largely independent channels-the informant's "veracity" or "reliability" and his "basis of knowledge." There are persuasive arguments against according these two elements such independent status. Instead, they are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.

*Id.* at 233, 103 S.Ct. at 2329 (citations omitted); *accord United States v. Roberson*, 90 F.3d 75, 77 (3d Cir.1996).

The same inquiries into veracity are not required when an ordinary citizen, who is a victim or witness to a crime, turns informant. Such citizens generally are deemed "more reliable than [an informant] who supplies information on a regular basis." *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)(Harlan, J. dissenting). For example, "[t]here is an assumption grounded in common experience that [an ordinary citizen], in reporting criminal activity, would be motivated by factors which are consistent with law enforcement goals." *Sanducci v. City of Hoboken*, 315 N.J.Super. 475, 482, 719 A.2d 160 (App.Div.1998)(citing *State v. Davis*, 104 N.J. 490, 506, 517 A.2d 859 (1986)); *see also United States v. Williams*, 3 F.3d 69, 72 (3d Cir.1993)(confirming the reliability of "the proverbial 'disinterested witness' ").

In *Gates*, the Supreme Court also emphasized the importance of independent police work corroborating the anonymous informant's tip under the "totality of the circumstances" test. *See Gates*, 462 U.S. at 241, 103 S.Ct. at 2334. It is well–established that such corroboration can come from other tips. *See, e.g., United States v. Fulgham*, 143 F.3d 399, 401 (8th

---

**37.** In *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 744 A.2d 1146 (2000), the Supreme Court of New Jersey recently defined probable cause:

> Probable cause exists if at the time of the arrest "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964); *see also State v. Waltz*, 61 N.J. 83, 87, 293 A.2d 167 (1972) (describing probable cause as a "well-grounded" suspicion that a crime has been or is being committed).
>
> Although it eludes precise definition, probable cause "is not a technical concept but rather one having to do with 'the factual and practical considerations of every day

life' upon which reasonable men, not constitutional lawyers, act." *Waltz*, 61 N.J. at 87, 293 A.2d 167 (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949)). Thus, "the common and specialized experience and work-a-day knowledge of police [officers] must be taken into account." *State v. Contursi*, 44 N.J. 422, 431, 209 A.2d 829 (1965). Moreover, "[a]bstract contemplation will not suffice because the decisions of police officers must be made on the spur of the moment and cannot be viewed fairly from the vantage point of twenty-twenty hindsight." *Sanducci v. City of Hoboken*, 315 N.J.Super. 475, 481, 719 A.2d 160, (1998). "The answer must instead be found 'in the tumult of the streets.' " *Id.* (quoting *State v. Gerardo*, 53 N.J. 261, 264, 250 A.2d 130 (1969)).

*Id.* at 389–90, 744 A.2d 1146.

Cir.1998)(finding that tips provided by two informants were "reciprocally corroborative"); *United States v. Yarbrough,* 852 F.2d 1522, 1533 (9th Cir.1988) (" '[i]nterlocking tips from different confidential informants enhance the credibility of each.' ")(quoting *United States v. Landis,* 726 F.2d 540, 543 (9th Cir.1984)); *United States v. Laws,* 808 F.2d 92, 100–03 (D.C.Cir.1986)(finding that tips that were insufficiently reliable when considered separately were sufficiently reliable for a warrant to issue when considered together); *United States v. Wolfe,* 22 F.Supp.2d 627, (E.D.Mich.1998)(finding that two corroborative tips and independent investigation by the police supported probable cause). In light of this backdrop of relevant case law, I turn to the specific facts of this case to determine whether the Defendants had probable cause to arrest Santiago. Unfortunately, because there are genuine issues of material fact surrounding the moment of Santiago's seizure, I am unable to make the probable cause determination at this stage of the litigation.

The following facts are undisputed. On August 21, 1996, defendant D'Augostine received a telephone call from Wanda Wheeler, a citizen, who reported that while visiting a friend in the security office of Sears, she heard Santiago say that he kept a gun in his car and that he had carried the gun into the store. *See* Defs.' Ex. 42 (Wheeler Dep.) at 36. Wheeler told D'Augostine that she saw the gun case in the store and had heard Santiago state, on at least two prior occasions, that he kept a

gun in the trunk of his car. *See id.* at 35; *see also id.* at 36.[38]

D'Augostine testified that two weeks prior to Wheeler's phone call, he received information from a reliable confidential informant that Santiago was carrying a handgun inside Sears. *See* Defs.' Ex. 39 at 9. D'Augostine testified that this informant was "reliable" and "had been used in the past" to make arrests. *See id.* The Defendants do not provide any further information concerning the confidential informant's basis of knowledge or veracity.

After receiving Ms. Wheeler's phone call, D'Augostine testified that he approached another officer to handle the investigation of Santiago because D'Augostine knew that Santiago had filed a "federal lawsuit" against, among others, D'Augostine and the Police Department. *See id.* at 25–26. After the officer refused, D'Augostine testified that he contacted Sergeant Elliott, of Internal Affairs, and asked him to be an impartial observer during the investigation. *See id.* at 26. There is no evidence in the record that D'Augostine or any other Vineland officer attempted to corroborate further the two tips or to establish that Santiago did not possess a license to carry a handgun.

According to the police report of the arrest, which was authored by D'Augostine, he and Sergeant Elliott, along with three other Vineland officers not parties in this case, arrived at the Sears parking lot. *See* Defs.' Ex. 7 at 2. According to the report, D'Augostine and the officers located Santiago's vehicle in the parking lot[39]

**38.** Santiago attempts to establish that Ms. Wheeler was a biased informant by showing that *after* she provided the Vineland Police Department with the information concerning Santiago's possession of a firearm, she applied to the Department for the position of police dispatcher. *See* Pl.'s Br. at 18 (citing Defs.' Ex. 51 (Brunetta Dep.) at 101). Considering that Ms. Wheeler's application was not pending at the time she provided the tip to D'Augostine, Ms. Wheeler was not offered the job, *see* Defs.' Ex. 51 at 100, and Santiago has adduced no other information regarding Ms. Wheeler's credibility, this Court finds that

Santiago has not raised a genuine issue of material fact as to Ms. Wheeler's veracity.

**39.** The police report of Santiago's arrest is inconsistent with D'Augostine's testimony. The report states that on August 21, 1996, a confidential source, who had provided information to D'Augostine in the past, called and stated that Santiago had a handgun concealed inside his vehicle in the parking lot of Sears. *See* Defs.' Ex. 7 at 1. According to the report, the informant stated that Santiago's vehicle was a 1990 grey Maxima, with the New Jersey registration # CS248V NJ. *See id.* at 2.

and awaited Santiago's exit from Sears. *See id.*

At this point, the facts of the arrest contained in the summary judgment record diverge. According to the report, upon Santiago's exit from the store, Sergeant Elliott approached him and "explained ... that we had received information that he had a handgun inside his parked vehicle. Luis Santiago stated 'the gun in the trunk of his vehicle.'[40] At this time I then advised Luis Santiago of his Miranda Warnings...." *Id.* According to the report's version of events, *after* Santiago received his *Miranda* warnings and waived his rights, he stated that he brought the gun across state lines and he consented to a search of his car. *See id.* Santiago then pointed to the Glock 9 millimeter handgun contained in the trunk of his vehicle and produced a valid permit to purchase the handgun. *See id.* At that point in time, the Defendants determined that while Santiago possessed a permit to purchase the handgun, he did not possess a license to carry the firearm. *See id.* The officers also discovered bullets in the passenger compartment of Santiago's vehicle. *See id.* at 3.

Contrary to the report's description of events, the deposition testimony of its author, defendant D'Augostine, differs with respect to the time of Santiago's arrest. Specifically, D'Augostine testified that Santiago was arrested "after the investigation and after he was Mirandized." Defs.' Ex. 55 (D'Augostine Dep.) at 21. According to D'Augostine's testimony, therefore, the officers would have discovered that Santiago did not possess a license to carry the handgun prior to the moment of arrest.

The issue before this Court is whether the police had probable cause to arrest Santiago. For purposes of the Fourth Amendment, "[a]n arrest requires either physical force ... or where, that is absent, submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991); *Sharrar v. Felsing*, 128 F.3d 810, 819 (3d Cir.1997); *see also Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)(stating that seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...."); *I.N.S. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984)(stating that a person has been seized, for Fourth Amendment purposes, "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"); *Berg v. County of Allegheny*, 219 F.3d 261, 268–69 (3d Cir.2000)("A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement").

From this contradictory and sparse record, this Court cannot determine at which point Santiago was arrested by the defendant officers, thereby clouding the issue of probable cause. On the one hand, if the arrest occurred after the Defendants conducted their "investigation" on the scene, in which they discovered the gun and the fact that he did not possess a license to carry the handgun, probable cause would be likely. On the other hand, if the arrest occurred immediately following Santiago's exit from Sears, at the time the police report states that Santiago was given his

---

This report is in direct contradiction of D'Augostine's testimony that the confidential informant contacted him two weeks before August 21, 1996. *See* Defs.' Ex. 39 at 9.

**40.** The meaning of the incoherent sentence fragment "the gun in the trunk of his vehicle" is beyond the grasp of this Court. Quite obviously, if the statement is interpreted as an

admission that a gun was located in the trunk of his car, such an admission would lend some support to a finding that the police had probable cause to arrest. Because of the complete ambiguity of this statement, I will not interpret the statement as either an admission or denial by Santiago that a gun was in the trunk of his car.

*Miranda* rights, the likelihood of probable cause diminishes.

The latter scenario causes this Court to take pause. The central question would become whether, without further corroboration by the police, probable cause to arrest exists when two named informants, one confidential and one a citizen, provide corroborating information to the police of activity, no part of which is *per se* illegal.[41] Specifically, the Defendants received corroborative tips that Santiago possessed a handgun, which is only illegal if the owner failed to obtain a permit to carry the weapon. *See* N.J.S.A. 2C:39–5(b) (West Supp. 2000).[42]

Quite obviously, this probable cause determination would result in an inappropriate advisory opinion from this Court. The facts as they are set forth in this record are so divergent that I am unable to make not only a probable cause determination, but an informed qualified immunity decision. For those reasons, I shall deny the summary judgment motions on Santiago's common law false arrest claim and deny without prejudice the Defendants' motions for summary judgment on Santiago's federal false arrest claim on the ground of qualified immunity. The Defendants shall have the right to renew the qualified immunity motions after I have held a full evidentiary hearing on the record to determine the question of probable cause.

On a final note, like all claims brought under 42 U.S.C. § 1983 in this case, the Defendants move for summary judgment on the basis that: (1) the City of Vineland did not act pursuant to a policy or custom and therefore it cannot be liable; and (2) the individual defendants were not personally involved. Because Santiago does not provide any opposition to the motions of any of the Defendants on Santiago's federal false arrest claim, I find that summary judgment would be "appropriate" with respect to all of the Defendants except D'Augostine. No reasonable factfinder could conclude on the facts set forth in this summary judgment record that the City of Vineland maintained any sort of policy relevant to Santiago's allegation of false arrest, or that any party to this suit, except D'Augostine, was personally involved or had knowledge of the arrest itself. Accordingly, I shall grant the motions of the City of Vineland and individual defendants Romano, Gallo, Brunetta, Letizia and Fresne and deny the motion of D'Augostine for summary judgment on Santiago's *federal* false arrest claim pursuant to 42 U.S.C. § 1983. I do not, however, intimate any view with respect to Santiago's false arrest claim under New Jersey law because the Defendants have not moved for summary judgment on that ground.

## E. Malicious Prosecution

■ This Court is satisfied that it also must deny the motions of the Defendants on Santiago's common law claim of malicious prosecution and deny without prejudice the Defendants' motions for summary

41. Recently, in the context of the necessary reasonable suspicion required for a *Terry* stop, which is a lower threshold than probable cause, the Supreme Court stated that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, — U.S. ——, 120 S.Ct. 1375, 1379, 146 L.Ed.2d 254 (2000). Although, as set forth below, it is unnecessary for this Court to make a probable cause determination in this case, an argument can be made that the proposition that the tip must supply information of illegality to support a law enforcement officer's reasonable suspicion that criminal activity is afoot, is also applicable to the more stringent probable cause standard.

42. N.J.S.A. 2C:39–5 provides, in relevant part, that "[a]ny person who knowingly has in his possession any handgun, including any antique handgun without first having obtained a permit to carry the same as provided in N.J.S. 2C:58–4, is guilty of a crime in the third degree." *Id.* at 2C:39–5(b). An important exception to the license requirement provides that the legal owner of a handgun may temporarily transfer a handgun to, among other things, a firing range or pistol club, without a license to carry. *See* N.J.S.A. 2C:39–5; N.J.S.A. 2C:58–3.1 (West Supp.2000).

judgment on Santiago's federal malicious prosecution claim on the ground of qualified immunity. To establish malicious prosecution under section 1983, a plaintiff must establish that: (1) the defendants initiated a criminal proceeding against the plaintiff; (2) which resulted in a seizure; (3) the criminal prosecution resulted in plaintiff's favor; (4) the proceeding was initiated without probable cause; and (5) the defendant acts maliciously or for a purpose other than bringing the plaintiff to justice. *See Luthe v. The City of Cape May,* 49 F.Supp.2d 380, 393 (D.N.J.1999)(Orlofsky, J.); *see also Myrick v. Resorts Int'l Casino & Hotel,* 319 N.J.Super. 556, 563, 726 A.2d 262 (App.Div.1999)(quoting *Lind v. Schmid,* 67 N.J. 255, 262–63, 337 A.2d 365 (1975))(establishing elements for malicious prosecution under New Jersey law as: (1) criminal action instituted by the defendant; (2) which was actuated by malice; (3) there was an absence of probable cause for the proceeding and (4) it was terminated in plaintiff's favor).

 As set forth above, I cannot determine on this record whether, under the malicious prosecution analyses, the Defendants acted with probable cause. The Defendants contend that even if Santiago can establish that they did not act with probable cause, they are entitled to qualified immunity on Santiago's federal claim. Finding that such a determination would be premature, I shall deny without prejudice the Defendants' motions for summary judgment on the ground of qualified immunity on Santiago's federal claim of malicious prosecution to the right of the Defendants to renew such motions after this Court has conducted a full evidentiary hearing.

Also as set forth above, I shall grant the motions for summary judgment of the City of Vineland and individual defendants Romano, Gallo, Brunetta, Letizia and Fresne for summary judgment on Santiago's federal malicious prosecution claim pursuant to 42 U.S.C. § 1983 because Santiago has failed to establish the existence of a genuine issue of material fact that the City of Vineland acted pursuant to a policy or custom or that any of the aforementioned individual defendants were personally involved in or had knowledge of and acquiesced in the events underlying Santiago's malicious prosecution claim. I shall deny, however, the motion for summary judgment with respect to D'Augostine because a genuine issue of material fact exists as to D'Augostine's personal involvement in Santiago's claim. Like Santiago's claims for false arrest, I do not intimate any view with respect to the Defendants' liability under Santiago's state claim for malicious prosecution because the Defendants have failed to move for summary judgment on that ground.

## F. Common Law Breach of Contract and Intentional Interference with Contractual Relationship

Counts Seven and Eight of the Amended Complaint contain common law claims of breach of contract against all defendants and intentional interference with Santiago's contractual relationship with the City of Vineland against the individual defendants. *See* Am. Compl. at ¶¶ 68–73. Specifically, Santiago alleges in Count Seven that, based upon an alleged official nondiscrimination policy of the City of Vineland, an implied contract existed between the City of Vineland and himself, which was breached when the various Defendants committed the allegedly discriminatory acts discussed in this case. *See* Am. Compl. at ¶¶ 68–70.[43] Santiago alleges in

---

**43.** Count Seven of the Amended Complaint provides, in pertinent part:

At all times relevant to this matter, it was the official policy of the Defendant, City of Vineland, to treat all employees fairly and justly and without regard to race[,] ethnic-

ity, national origin, nepotism or favoritism.... The aforesaid policies were a material part of Plaintiff's employment relationship with the defendant, City of Vineland.... The aforesaid acts of the defendants constituted a breach of the aforesaid

Count Eight of the Amended Complaint that the discriminatory acts of the individual defendants in this case intentionally interfered with the implied contract between Santiago and the City of Vineland. *See id.* at ¶¶ 72.[44] Defendants Brunetta, Letizia, Fresne and D'Augostine[45] move for summary judgment on the ground that Santiago's contract claims are preempted by the NJLAD because the common law claims are premised upon the same discriminatory conduct as alleged under the state statute. As is the common thread in this case, Santiago does not provide any real opposition to the motion for summary judgment.[46] For that reason, summary judgment shall be granted if "appropriate." *See* Fed.R.Civ.P. 56(e).

 Under New Jersey law, an employee at will "has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 72, 417 A.2d 505 (1980); *accord Lawrence v. National Westminster Bank New Jersey,* 98 F.3d 61, 73 (3d Cir. 1996). The sources of public policy include, among others, state legislation. *See Pierce,* 84 N.J. at 72, 417 A.2d 505; *accord Lawrence,* 98 F.3d at 73. The NJLAD explicitly provides that it is the public policy of the State of New Jersey to prohibit discrimination on the basis of "race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation ... or nationality...." N.J.S.A. 10:5-3 (West Supp.2000). New Jersey courts and courts interpreting New Jersey law have held that common law claims for wrongful discharge in violation of public policy are preempted when a statutory remedy under the NJLAD exists. *See Lawrence,* 98 F.3d at 73 ("[b]ecause the sources of public policy [plaintiff] relies on are coterminous with his statutory claims, he cannot advance a separate common law public policy claim"); *Caldwell v. KFC Corp.,* 958 F.Supp. 962, 970 (D.N.J.1997)(Irenas, J.)(same); *Schanzer v. Rutgers Univ.,* 934 F.Supp. 669, 678–79 (D.N.J.1996)(Simandle, J.)(same); *Kapossy v. McGraw–Hill, Inc.,* 921 F.Supp. 234, 249 (D.N.J.1996)(Orlofsky, J.)("common law claim for wrongful termination is not viable insofar as it seeks the same remedy available under the [NJLAD]"); *Catalane v. Gilian Instrument Corp.,* 271 N.J.Super. 476, 492, 638 A.2d 1341 (App.Div.1994)(providing that supplementary common law causes of action are precluded when a statutory remedy under the NJLAD exists); *cf. Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 569 A.2d 793, (1990)(considering, in dicta, that "if the [NJLAD] creates a remedy, 'it might be unnecessary to recognize or create a Pierce-type action to vindicate substantially the same rights and provide similar relief.' ")(quoting *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 454, 561 A.2d 1130 (1989)). This Court has discovered one New Jersey published opinion that extends the argument to duplicative contract claims. *See DeCapua v. Bell Atlantic–New Jersey, Inc.,* 313 N.J.Super. 110,

---

contractual relationship and as a result thereof, Plaintiff sustained previously described injuries and damages. Am. Compl. at ¶¶ 68–70.

**44.** Paragraph 72 of the Amended Complaint provides that "[t]he aforesaid actions of the *individual* defendants constituted an intentional interference with Plaintiff's contractual relationship with his employer, Defendant, City of Vineland." Am. Compl. at ¶ 72.

**45.** Defendants City of Vineland, Joseph Romano and John Gallo do not move for summary judgment on Santiago's contract claims.

**46.** In opposition to the motion for summary judgment on his contract claims, Santiago merely contends that "[a]s previously outlined in this brief, there are genuine issues of material fact regarding the motives behind the Defendants [sic] actions. There are also genuine issues of fact as to whether the actions of the Defendants constituted witness tampering and fabrication of evidence. Those issues must ultimately be decided by a jury. At that time, the Court will be in a position to ascertain whether Plaintiff's common law causes of action can stand." Pl.'s Br. at 41. Quite clearly, Santiago does not address the contentions of the Defendants made in support of the motion for summary judgment.

127–28, 712 A.2d 725 (Law Div.1998)(finding that employee's NJLAD claim barred duplicative breach of contract claim, where contract claim was based upon harassment policy).

 Quite clearly, Santiago's supposed common law "contract" claims seek to vindicate the same rights as those recognized by the NJLAD. On a certain level, this Court believes that by fashioning Counts Seven and Eight as contract claims, Santiago attempted to artfully plead around the fact that the true nature of the claims was wrongful discharge in violation of the public policy as clearly set forth in the NJLAD and discrimination by the individual defendants. I need not decide whether this is so, however, because I am satisfied that as alleged, the common law claims are duplicative of the cause of action under the NJLAD and therefore are preempted by the statute. Clearly, Counts Seven and Eight of the Amended Complaint are premised upon the same conduct alleged as discriminatory under his claim under the NJLAD and seek the same remedies. *See, e.g., DeCapua v. Bell Atlantic–New Jersey, Inc.,* 313 N.J.Super. 110, 127–28, 712 A.2d 725 (Law Div.1998)(finding that employee's NJLAD claim barred duplicative breach of contract claim, where contract claim was based upon harassment policy). Considering also that Santiago provides no opposition to the motion, this Court shall grant the motion of defendants Brunetta, Letizia, Fresne, and D'Augostine for summary judgment on Counts Seven and Eight of the Amended Complaint.

As was set forth above, the City of Vineland and defendants Romano and Gallo did not move for summary judgment on Santiago's alleged "contract" claims. In light of my holding that these claims are duplicative of Santiago's discrimination claims, I shall grant summary judgment on Count Seven as against defendants City of Vineland, Romano and Gallo, and on Count Eight as against defendants Romano and Gallo. This Court does not condone the failure of defendants City of Vineland, Romano and Gallo to so move for summary judgment; instead, this Court grants summary judgment in the interests of fairness and judicial efficiency because Santiago's contract claims cannot lie against these particular defendants. In sum, then, I shall grant summary judgment as to all defendants on Counts Seven and Eight of the Amended Complaint.

### G. The Tort of "Outrage"

 In the final count of the Amended Complaint, Santiago alleges that the "aforesaid acts of the Defendants directed at the Plaintiff were without purpose or justification and constituted an outrage," therefore warranting the award of punitive damages. Am. Compl. at ¶ 74. Under New Jersey law, the tort of outrage, also known as intentional infliction of emotional distress, requires a plaintiff to establish that a defendant's intentional or reckless conduct was " '[s]o outrageous in character, and so extreme in degree, as to go beyond all possible bound of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Kozar v. AT & T,* 923 F.Supp. 67, 69 n. 3 (D.N.J.1996)(Orlofsky, J.)(citing *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 365–66, 544 A.2d 857 (1988)).

After reviewing the two summary judgment briefs in this case, this Court is satisfied that the Defendants never once raise either the tort of outrage or its more common name, intentional infliction of emotional distress. Accordingly, for the reasons set forth in Part III(B)(3)(b) of this Opinion, I find that the Defendants failed to move for summary judgment on Count Nine of Santiago's Amended Complaint.

### H. Santiago's Claims for Punitive Damages

Finally, Santiago alleges that he is entitled to punitive damages under his various statutory and common law claims as set forth in the Amended Complaint. The

Defendants move for summary judgment on all of Santiago's claims for punitive damages on the ground that the conduct in this case does not warrant an award of punitive damages. In opposition to the motions, Santiago contends that the question of punitive damages is one for the jury and cannot be decided on these summary judgment motions.

At this point, the following claims remain in Santiago's Amended Complaint: (1) race discrimination, in violation of 42 U.S.C. §§ 1981 and 1983, against individuals Brunetta, D'Augostine and Fresne; (2) race discrimination, in violation of the NJLAD, against the City of Vineland and individuals Brunetta, D'Augostine and Fresne; (3) retaliation, in violation of the ADA, against the City of Vineland; (4) procedural due process, false arrest and malicious prosecution, in violation of 42 U.S.C. § 1983, against various individual defendants; (5) false arrest and malicious prosecution, in violation of New Jersey law, against all defendants; and (6) intentional infliction of emotional distress, in violation of New Jersey law, against all defendants. I shall address the summary judgment motion of the City of Vineland, and then move to the motions of the individual defendants.

### 1. *The City of Vineland*

■■■■ As a matter of law, the City of Vineland is entitled to summary judgment on Santiago's claims for punitive damages under the ADA, *see* 42 U.S.C. § 1981a(b)(1)(1994)(providing that a complaining party may not recover punitive damages against a government, government agency or political subdivision); *see also Herman v. City of Allentown,* 985 F.Supp. 569, 581 (E.D.Pa.1997), and the New Jersey claims of false arrest, malicious prosecution and intentional infliction of emotional distress. *See* N.J.S.A. 59:9–2 (West 2000)(providing that no punitive damages shall be awarded against a public

entity); N.J.S.A. 59:2–10 (West 2000)(providing that a public entity is not liable for the acts of a public employee constituting "a crime, actual fraud, actual malice, or willful misconduct"); *see also Soto v. City of Newark,* 72 F.Supp.2d 489, 497 (D.N.J.1999)(Wolin, J.)(finding that public entities may not be held liable for intentional acts of its employees);[47] *Marion v. Borough of Manasquan,* 231 N.J.Super. 320, 333, 555 A.2d 699 (App.Div.1989)(finding that municipality is immune from punitive damages in false arrest case).

■■■■ However, as a matter of law, a municipality may be liable for punitive damages under the NJLAD. *See Cavuoti v. New Jersey Transit Corp.,* 161 N.J. 107, 113, 735 A.2d 548 (1999)(holding that a public entity may be liable for punitive damages under the NJLAD). It is well established under New Jersey law that an " 'employer should be liable for punitive damages [under the NJLAD] only in the event of actual participation by upper management or willful indifference.' " *Id.* at 117, 735 A.2d 548 (quoting *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 625, 626 A.2d 445 (1993)). To recover punitive damages under New Jersey law, a defendant must have acted with " 'actual malice' " or " 'a wanton and wilful disregard of persons who might be harmed . . . .' " *Cavuoti,* 161 N.J. at 120 n. 2, 735 A.2d 548 (quoting N.J.S.A. 2A:15–5.12 (West 2000)). Under New Jersey law:

> To warrant a punitive damage award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an evil minded act or an act accompanied by a wanton and wilful disregard of the rights of another. The key to the right to punitive damages is the wrongfulness of the intentional act . . . . Our cases indicate that the requirement [of willfulness and wantonness] may be satisfied upon a showing

---

**47.** Unfortunately, there is nothing in the summary judgment brief of the City of Vineland to allow me even to infer that it has moved for

summary judgment on Santiago's claim for the intentional infliction of emotional distress.

that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences.

*Id.* (citations and quotations omitted).

█ In this case, the genuine issues of material fact abound as to which the individual defendants were members of "upper management," as defined by the Supreme Court of New Jersey in *Cavuoti,* and whether those individual defendants participated in the alleged discrimination against Santiago with the requisite degree of wilful and wanton conduct. As "[t]he issue of punitive damages is a fact question which should be decided by a jury," *Domm v. Jersey Printing Co., Inc.,* 871 F.Supp. 732, 739 (D.N.J.1994)(Pisano, Mag. J.); *accord Naporano Iron & Metal Co. v. American Crane Corp.,* 79 F.Supp.2d 494, 512 (D.N.J.1999)(Greenaway, J.), I shall deny the motion of the City of Vineland for summary judgment on Santiago's race discrimination claim under the NJLAD.

### 2. *The Individual Defendants*

█ As a matter of law, individual defendants may be liable under 42 U.S.C. §§ 1981 and 1983, the NJLAD and the New Jersey claims of false arrest, malicious prosecution and intentional infliction of emotional distress. Specifically, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see also White v. Washington Public Power Supply Sys.,* 692 F.2d 1286, 1290 (9th Cir.1982)("[p]unitive damages are available against individuals under sections 1981, 1983, or 1985(3)"); *Roberson v. Bowie State Univ.,* 899 F.Supp. 235, 238 (D.Md.1995)(finding that punitive damages are available under § 1981 only in individual, not official, capacity suits); *Clark v. City of Macon, Georgia,* 860 F.Supp. 1545,

1553 (M.D.Ga.1994)(finding individuals can be liable for punitive damages under 42 U.S.C. § 1981). Moreover, the Court of Appeals for the Third Circuit has implicitly held that supervisors who aid and abet discrimination under the NJLAD can be liable for punitive damages. *See Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 128 (3d Cir.1999)(vacating order of District Court which struck plaintiff's punitive damage claim against individual supervisor). Finally, employees of a municipality may be liable for punitive damages in cases of false arrest, malicious prosecution and intentional infliction of emotional distress, despite the immunity of the municipality. *See, e.g., Marion v. Borough of Manasquan,* 231 N.J.Super. 320, 333, 555 A.2d 699 (App.Div.1989)(finding that public employees are not immune from punitive damages claims under New Jersey Tort Claims Act).

█ As was set forth above, the issue of whether the actions or inaction of the defendants reached the appropriate level of recklessness or wilfulness is generally a question for the jury. In this case, I find that Santiago clearly has met his burden of raising genuine issues of material fact as to the individual defendants' degree of conduct under New Jersey and federal law. Accordingly, I shall deny the motions of the individual defendants on Santiago's claims for punitive damages.

## IV. CONCLUSION

The issues in this case, while not especially complex, have been clouded and complicated by the extremely poor advocacy of counsel. This Court has struggled not with legal issues, but with the impossible task of simply interpreting the convoluted and confusing briefs filed by counsel in support of, and in opposition to, summary judgment. It is this Court's hope and fervent wish that the quality of representation improves for the remainder of this case.

For the reasons set forth above, I shall: (1) grant the motions of all defendants for summary judgment on Santiago's Title VII claim, as set forth in Count One of the Amended Complaint; (2) grant the motions of defendants Romano, Gallo and Letizia but deny the motions of the City of Vineland, Brunetta, D'Augostine and Fresne on Santiago's claim under the NJLAD, as set forth in Count Two of the Amended Complaint; (3) grant the motions of the City of Vineland, Romano, Gallo and Letizia but deny the motions of Brunetta, Fresne and D'Augostine with respect to Santiago's claims of race discrimination pursuant to 42 U.S.C. §§ 1981 and 1983, as set forth in Count Three of the Amended Complaint; (4) grant the motions of the City of Vineland, Fresne and D'Augostine but deny the motions of Brunetta, Letizia, Romano and Gallo with respect to Santiago's procedural due process claim, pursuant to 42 U.S.C. § 1983, as set forth in Count Three of the Amended Complaint; (5) grant the motions of all defendants except D'Augostine with respect to Santiago's federal claims of false arrest and malicious prosecution, pursuant to 42 U.S.C. § 1983, as set forth in Count Three of the Amended Complaint; (6) grant the motions of all defendants with respect to Santiago's conspiracy claim, pursuant to 42 U.S.C. § 1985(1), as set forth in Count Three of the Amended Complaint; (7) deny the motions of all defendants with respect to any claim contained in Count Three of the Amended Complaint not explicitly decided by this Court; (8) grant the motions of all defendants with respect to Santiago's claims under the ADA and the NJLAD as set forth in Count Four of the Amended Complaint; (9) deny the motions of all defendants on Santiago's New Jersey State law claims of false arrest and malicious prosecution as set forth in Count Five of the Complaint; (10) grant the motions of all individual defendants and deny the motion of the City of Vineland with respect to Santiago's claim for retaliation under the ADA, as set forth in Count Six of the Amended Complaint; (11) grant the motions for summary judgment with respect to all defendants on Santiago's State claims of breach of contract and intentional interference with a contractual relationship, as set forth in Counts Seven and Eight of the Amended Complaint; (12) grant the motion of the City of Vineland for summary judgment on Santiago's remaining claims for punitive damages under the ADA and New Jersey claims of false arrest, malicious prosecution and intentional infliction of emotional distress, but deny the motion of the City of Vineland with respect to Santiago's claim for punitive damages under the NJLAD; and (13) deny the motions of the individual defendants for summary judgment on all of Santiago's remaining claims for punitive damages.

For the sake of clarity, this Court further notes that certain parties in this case did not appropriately move for summary judgment in the following instances: (1) defendant City of Vineland failed to move appropriately for summary judgment on Santiago's claim of ADA retaliation, as set forth in Count Six of the Amended Complaint; (2) all parties failed to move appropriately for summary judgment on Santiago's tort claim of outrage, otherwise known as intentional infliction of emotional distress, as set forth in Count Nine of the Amended Complaint.

Finally, this Court notes that it has denied without prejudice two motions for summary judgment. First, the motions of the individual defendants for summary judgment on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD, as set forth in Counts Two and Three of the Amended Complaint, on the ground of qualified immunity, shall be denied without prejudice. The remaining individual defendants shall have the right to refile for summary judgment only on the ground of qualified immunity, and to submit briefs on the issue within twenty days of the date of this Opinion and Order. Second, the motions of the individ-

ual defendants on Santiago's federal claims of false arrest and malicious prosecution for summary judgment on the ground of qualified immunity, which in light of this Court's disposition of the other motions for summary judgment, essentially leaves only defendant D'Augostine, shall be denied without prejudice. Defendant D'Augostine shall have the right to refile such motion after this Court has conducted a full evidentiary hearing on the issue of probable cause.

The Court shall enter an appropriate order.

## ORDER

This matter having come before the Court on the motion of Defendants City of Vineland, Joseph Romano and John P. Gallo, and on the motion of Defendants Mario Brunetta, Paul Letizia, John Fresne and Dennis D'Augostine for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), Lars S. Hyberg, Esq. of McAllister, Hyberg & White, P.C., appearing on behalf of Defendants City of Vineland, Joseph Romano and John P. Gallo, and A. Michael Barker, Esq. and Joseph M. Scott, Esq. of A. Michael Barker, P.C., appearing on behalf of Defendants Mario Brunetta, Paul Letizia, John Fresne, and Dennis D'Augostine, and F. Michael Daily, Jr., Esq. of Quinlan, Dunne & Daily, P.A., appearing on behalf of Plaintiff, Luis A. Santiago; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 2nd day of August, 2000, hereby ORDERED that:

1. The motion of Defendants City of Vineland, Joseph Romano and John P. Gallo and the motion of Defendants Mario Brunetta, Paul Letizia, John Fresne and Dennis D'Augostine are GRANTED in part and DENIED in part; and,

2. The motions for summary judgment on Santiago's claim under Title VII, as set forth in Count One of the Amended Complaint, are GRANTED with respect to all defendants in this case; and,

3. The motions for summary judgment on Santiago's claim of race discrimination under the NJLAD, as set forth in Count Two of the Amended Complaint, are GRANTED with respect to defendants Romano, Gallo and Letizia and DENIED with respect to the City of Vineland, Brunetta, D'Augostine and Fresne; and,

4. The motions for summary judgment on Count Three of the Amended Complaint are GRANTED in part and DENIED in part as follows:

 a. The motions for summary judgment on Santiago's claims for race discrimination, pursuant to 42 U.S.C. §§ 1981 and 1983 are GRANTED with respect to the City of Vineland, Romano, Gallo and Letizia and DENIED with respect to Brunetta, D'Augostine and Fresne; and,

 b. The motions for summary judgment on Santiago's claims of procedural due process, pursuant to 42 U.S.C. § 1983 are GRANTED with respect to the City of Vineland, Fresne and D'Augostine and DENIED with respect to Brunetta, Letizia, Romano and Gallo; and,

 c. The motions for summary judgment on Santiago's federal claims of false arrest and malicious prosecution, pursuant to 42 U.S.C. § 1983 are GRANTED with respect to all defendants *except* D'Augostine; and,

 d. The motions for summary judgment on Santiago's conspiracy claim, pursuant to 42 U.S.C. § 1985(1) are GRANTED with respect to all defendants; and,

e. The motions for summary judgment on any other claims allegedly raised under Count Three and not explicitly decided by this Court are DENIED as to all defendants; and,

5. The motions for summary judgment on Santiago's claims under the ADA and the NJLAD, as set forth in Count Four of the Amended Complaint are GRANTED with respect to all defendants; and,

6. The motions for summary judgment on Santiago's state law claims of false arrest and malicious prosecution, as set forth in Count Five of the Amended Complaint, are DENIED with respect to all defendants; and,

7. The motions for summary judgment on Santiago's claim for retaliation under the ADA, as set forth in Count Six of the Amended Complaint, are GRANTED with respect to all individual defendants and DENIED with respect to the City of Vineland; and,

8. The motions for summary judgment on Santiago's claims for breach of contract and intentional interference with a contractual relationship, as set forth in Counts Seven and Eight of the Amended Complaint, are GRANTED with respect to all defendants; and,

9. The motion of the City of Vineland for summary judgment on Santiago's claims for punitive damages is GRANTED with respect to Santiago's claims for punitive damages under the ADA and New Jersey claims of false arrest, malicious prosecution and intentional infliction of emotional distress and DENIED with respect to Santiago's claim for punitive damages under the NJLAD; and,

10. The motions of the individual defendants for summary judgment on Santiago's claims for punitive damages are DENIED; and,

IT IS FURTHER ORDERED that certain parties in this case did not appropriately move for summary judgment in the following instances:

1. Defendant City of Vineland failed to move appropriately for summary judgment on Santiago's claim of ADA retaliation, as set forth in Count Six of the Amended Complaint; and,

2. All parties failed to move appropriately for summary judgment on Santiago's tort claim of outrage, otherwise known as intentional infliction of emotional distress, as set forth in Count Nine of the Amended Complaint; and,

IT IS FURTHER ORDERED that the motions of the individual defendants for summary judgment on Santiago's race discrimination claims under 42 U.S.C. §§ 1981 and 1983 and the NJLAD, as set forth in Counts Two and Three of the Amended Complaint, on the ground of qualified immunity, are DENIED WITHOUT PREJUDICE to the right of the individual defendants to refile for summary judgment only on the ground of qualified immunity, and to submit briefs on the issue within twenty days of the date of this Order; and,

IT IS FURTHER ORDERED that the motion of defendant D'Augostine, for summary judgment on Santiago's federal claims of false arrest and malicious prosecution, on the ground of qualified immunity is DENIED WITHOUT PREJUDICE to the right of defendant D'Augostine to refile such motion on the ground of qualified immunity after this Court has conducted a full evidentiary hearing on the issue of probable cause.